J-A23029-16

2017 PA Super 98

| | |
|---|---|
| DENNIS A. RENNINGER AND PATSY D. RENNINGER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| A&R MACHINE SHOP AND CASS HUDSON COMPANY | |
| Appellee | No. 1896 WDA 2015 |

Appeal from the Judgment Entered November 12, 2015
In the Court of Common Pleas of Clarion County
Civil Division at No: 645 CD 2009

BEFORE: LAZARUS, STABILE, and STRASSBURGER,[*] JJ.

OPINION BY STABILE, J.:                    **FILED APRIL 11, 2017**

Appellants, Dennis A. Renninger and his wife, Patsy D. Renninger, appeal from the judgment of November 12, 2015. We affirm.

On May 25, 2007, Appellant Dennis Renninger was at work in the Clarion, Pennsylvania plant of his employer, Commodore Homes ("Commodore"), a manufacturer of modular homes, when he sustained a serious injury to his foot. While under construction, each modular home moves along an assembly on wheeled casters attached to its underside. Mr. Renninger was injured when a caster ran over his foot. Appellants sued

_____

[*] Retired Senior Judge assigned to the Superior Court.

Appellees A&R Machine Shop ("A&R")[1] and Cass Hudson Company ("Cass Hudson") as the designers, manufacturers and suppliers of the casters. Appellants alleged causes of action for strict products liability, negligence, breach of implied warranty, and loss of consortium causes of action, claiming the casters should have included toe guards. The case proceeded to a June 22-25, 2015 jury trial on Appellants' strict products liability/design defect claim.[2] The jury returned a defense verdict, finding Cass Hudson did not supply a defective product. Appellants filed timely post-trial motions on June 30, 2015. The trial court denied those motions on November 3, 2015. The verdict was reduced to judgment on November 12, 2015, and this timely appeal followed.

Appellant raises seven assertions of error, which we have reordered for clarity of analysis:

I.      Whether in its November 3, 2015 order, the trial court erred in denying [Appellants'] motion for post-trial relief which requested in the alternative either: (1) an order of a judgment notwithstanding the verdict setting aside the jury's verdict and issuing an award for [Appellants], or (2) ordering a new trial in this matter, where the issuance of such an order was clearly supported by the evidentiary record and controlling case law and the denial of such

---

[1] Appellants and A&R reached a settlement agreement prior to trial. A&R is not participating in this appeal.

[2] The trial court entered summary judgment in Appellees' favor on Appellants' manufacturing defect and failure to warn products liability causes of action. Appellants withdrew the negligence and breach of implied warranty claims prior to trial.

request deprived [Appellants] of an adequate statutory or legal remedy and was clearly contrary to the applicable case law.

II. Whether in its November 3, 2015 order, the trial court erred in finding that it properly allowed evidence and testimony of industry standards and employer conduct to be considered by the jury.

III. Whether the trial court erred in its April 17, 2015 order on motions in *limine* where it expressly stated that the Pennsylvania Supreme Court's ruling in [***Tincher***[3]] allowed for the introduction of the following at trial:

   (a)   Industry safety standards;
   (b)   OSHA safety standards;
   (c)   Employer conduct; and
   (d)   Conduct of third parties, including but not limited to assumption of risk by [Mr. Renninger].

IV. Whether in its November 3, 2015 order, the trial court erred in finding that it properly instructed the jury on the question of defective design of a product. Specifically, whether the court erred when it instructed the jury on the factors to consider in applying the risk utility analysis required pursuant to the Pennsylvania Supreme Court decision in [***Tincher***], when it instructed the jury to consider a seven-part test which was not adopted by the [***Tincher***] decision.

V. Whether the trial court erred when it failed to properly craft a jury verdict question and failed to place such jury questions in a sequence that resulted in the jury deciding the case before being asked to apply the risk utility analysis required by [***Tincher***]. Specifically, jury questions 1 and 2, which were generic questions that did not require the application of the risk utility analysis, and consequently this case was decided without the application of risk utility by the jury.

_____

[3] ***Tincher v. Omega Flex, Inc.***, 104 A.3d 328 (Pa. 2014).

VI.    Whether in its November 3, 2015 order, the trial court erred in finding that it properly disallowed a jury instruction on the doctrine of intended use in the context of products liability design defect cases pursuant to the Pennsylvania Supreme Court decision in [*Tincher*].

VII.    Whether the trial court erred in its January 27, 2011 order on [Appellees'] motions for summary judgment where it misapplied Pa.R.C.P. [No.] 1035.2, in that it relied upon an affidavit to prematurely grant summary judgment in favor of [Appellees] before the close of discovery and dismissed certain counts of [Appellants'] amended complaint; and more importantly used that same affidavit to conclude that the third party/employer was the designer of the subject product, and that neither [Appellee] designed the wheeled caster assemblies at issue.

Appellants' Brief at 4-6.

Before we analyze Appellants' legal arguments, we will review the facts introduced at trial. Mr. Renninger's job at Commodore was to help build and finish roofs. N.T Trial, 6/22/15, at 60. Mr. Renninger's plant built roughly ten to twelve homes at one time. N.T. Trial, 6/23/15, at 21. The homes under construction moved around the assembly line on casters bolted to their undersides. *Id.* at 22, 24. Originally, Commodore positioned the casters several feet inside of the home's outer frame, such that a moving caster could not run over the foot of a person standing alongside a moving home. *Id.* at 22-23, 92, 114-15; N.T. Trial, 6/24/15, at 96. Commodore repositioned the casters to the outer edge of the homes to prevent bowing in

the floor joists.[4]  *Id.*; N.T. Trial, 6/24/15, at 58.  Commodore modified twenty casters to accommodate the new location.  R 796-802.  Cass Hudson and A&R Machine subsequently supplied additional casters fabricated to meet the new specifications.  *Id.*  The twenty modified casters remained in use at the time of Mr. Renninger's accident, and it was not possible to distinguish the casters Commodore modified from the unmodified casters subsequently supplied by Cass Hudson.  *Id.*

Mr. Renninger's accident occurred while he was on the plant floor speaking to his foreman.  N.T. Trial, 6/23/15, at 26-28.  Mr. Renninger testified that Commodore never trained its employees on Occupational Safety and Health Administration ("OSHA") regulations regarding the plant floor.  *Id.* at 85.  Mr. Renninger was not aware of any OSHA regulation requiring the use of steel-toed boots on the plant floor, and he did not own steel-toed boots on the date of the accident.  *Id.* at 83-85.  He was wearing tennis shoes when the accident occurred, and he was aware that the casters did not have a guard to prevent the wheel from running over a foot.  *Id.* at 80.  Mr. Renninger also testified that the plant floor was not level, such that some of the wheels underneath a moving modular home would touch the ground while others did not.  *Id.* at 85-86.  Mr. Renninger believed a toe

---

[4]  The record indicates that Commodore switched from mobile to modular homes the year before Mr. Renninger's accident.  The interior placement of the casters worked for mobile homes but caused bowing in the floors of the modular homes.

guard on the caster would have prevented his injury. *Id.* at 96-97. Mr. Renninger did not believe a steel-toed boot would have prevented his injury. *Id.* at 97.

Richard Guzicki an employee of Appellee Cass Hudson who helped handle the Commodore account, testified that Cass Hudson is a distributor of casters and wheels. N.T. Trial, 6/24/15, at 5. Cass Hudson consults with its customers to determine an appropriate caster for their needs. *Id.* at 5, 17. Dale Toney, director of special operations for Commodore, testified that he relied on Guzicki to supply an appropriate wheel for the height and weight. *Id.* at 80, 83, 110. According to Guzicki, Cass Hudson does not advise customers on the need for toe guards in a given application, and does not analyze the safety needs at a customer's plant. *Id.* at 43-45. Likewise, Cass Hudson personnel did not visit the plant where the accident occurred. *Id.* at 47. Thus, Cass Hudson had no opportunity to observe the condition of the plant floor.[5]

Delbert Miller, one of the owners of A&R Machine Shop ("A&R"), testified that A&R fabricated the brackets that held the casters to the modular homes. N.T. Trial, 6/24/15, at 57. Cass Hudson is one of A&R's

---

[5] We observe that the plant closed shortly after the accident. Cass Hudson's legal team never had an opportunity to examine the plant, the floor, or the caster that caused the injury.

largest customers. *Id.* at 67-68. Like Guzicki, Miller never visited the plant where the accident occurred. *Id.* at 69.

Both parties produced expert witnesses. Paul Dreyer, a mechanical engineer and Appellants' expert witness, described the roles of Commodore, Cass Hudson, and A&R:

> Okay. Commodore is the manufacturer of the modular homes, so they know modular homes. A&R Machine is basically a machine shop that builds metal fabricated parts, things that drill holes and a certain size and shape. They supplied a metal fabric part which they called a bracket to Cass Hudson. And Cass Hudson took the bracket and mounted it to the caster assembly and then supplied it directly to Commodore to be used underneath the modular home.

N.T. Trial, 6/23/15, at 114. Dreyer testified that the casters attached to the outer edge of the modular homes were defective because they lacked a toe guard. *Id.* at 117.

> [T]he main reason why a toe guard is important for this particular application is because this is a very large wheel with a very heavy load. That can be very dangerous. And because of that circumstance, it needed to be—the workers needed to be protected from the possible movement of that very heavy load onto their foot.

*Id.* at 117-18.

Further:

> For this particular caster assembly to have, like I mentioned, a large wheel which has no guarding, no protection, which is—could instill a very serious injury on a worker who is paying attention to his job and not thinking that there's an imminent hazard, imminent danger right below him until obviously after it occurred. And if this caster had a guard assembly, a toe guard assembly, it might have pinched his foot but pushed it out of the way so it wouldn't be ridden completely

over and partially—according to the documents, partially up his ankle before they could get it off of his foot and cause that serious injury.

*Id.* at 120.   In Dreyer's opinion, the toe guard was preferable to using another worker as a spotter, and it was also preferable to using a buzzer or beeper on a moving modular home.  *Id.* at 121.  A spotter may not see everything, and a buzzer might not get the attention of a worker wearing ear protection.  *Id.*  Multiple homes moving along the assembly line and beeping could cause confusion.  *Id.*

Dreyer stated that Cass Hudson's suppliers offer toe guards for sale in their catalogues, but he acknowledged that a toe guard for the casters Commodore purchased would have needed to be custom designed.  *Id.* at 118.  A custom designed toe guard would have increased the cost of each caster by 10 to 12 percent.  *Id.* at 123-25.  Dreyer said it should have been obvious to Cass Hudson that a toe guard was necessary, once the casters were moved to the outer edge of the modular homes.  *Id.* at 206.

Dreyer believed the use of a toe guard would have been in accord with industry standards.  "The caster industry has done that analysis and come up with a couple of different toe guard designs, and I have my faith in their industry that that design minimizes injury."  *Id.* at 161.   Commodore's compliance, or lack thereof, with OSHA regulations was not relevant to Dreyer's analysis of the product design.  *Id.* at 201, 209.

The defense expert, Gary Hutter, testified that no industry standard requires heavy-duty casters to have toe guards. N.T. Trial, 6/24/15, at 167-68.

> Q. Is that a standard that exists in the wheel supply industry?
>
> A. No, it is not. It's not a standard in the wheel supply industry, nor is it a requirement by OSHA. I'm on an ANSI [American National Standards Institute] committee that's involved with casters. I voted on two of their standards. It's not a requirement in those standards either.
>
> Q. Do you know of any law, any regulation, any standard or any literature that coincides with Mr. Dreyer's opinion that all heavy-duty casters must contain guards?
>
> A. No, I'm not aware of anything like that.
>
> Q. Have you ever heard any person or any expert offer that opinion at any other time than in this case?
>
> A. No, I have not.
>
> Q. Can you tell us what the standard is with regard to a reasonable seller of a caster dolly and wheels such as that we're dealing with here?
>
> A. Well, in essence, the caster dolly is a component in a product, the product being the—this house that's being made, and it's a component someone's buying—
>
> [At this point, Appellants' Counsel successfully objected to Hutter's characterization of the caster as a component of the modular home]
>
> Q. Setting aside components, what is the—what is the standard of what a reasonable seller is expected to comply with when they are selling a caster dolly as was sold in this particular case.
>
> A. In essence, that it would be compliant with codes and standards, that it would be reasonably safe, that it would

perform the utility as they understood the utility to be, those kinds of things.

     Q.    And in this particular case, is it your opinion that Cass Hudson complied with the standard—the applicable standard that you just indicated or that it did not comply?

     A.    Yes, that it did.[6]

*Id.* at 169-71.

Hutter further elaborated on the ANSI standards:

Now, wheels have been around for a long time; and most of the wheels we encounter do not have any kind of wheel bearings on them. Now, in some situations, maybe a wheel bearing makes sense; but let's see if the codes and standards require wheel bearings. When I went to the ANSI code—and ANSI is American National Standards Institute. They have codes on casters and wheels. I voted on their standards on those issues. They do not require that wheel guard or any wheel guard is mandatory on—on this kind of product. You go to the codes and standards and you look. Well, what do we need? And I've said this repeatedly. You have a trained person. You have spotters. You—you have safety shoes. You make sure the area is clean. In addition, you might use a horn. You might use a light. You might use other kinds of communication. You make sure that there isn't going to be a problem because this would be like driving a heavy forklift truck and not being able to see what's in front of you.

*Id.* at 226. As we will explain below, Appellants have not developed any argument challenging Hutter's testimony that Appellee's casters met industry and ANSI standards.

_____

[6] Given this testimony, Appellee's assertion that it introduced no evidence of industry standards is incorrect. ***See*** Appellee's Brief at 11.

Hutter confirmed that Cass Hudson was not in the fabrication business and could not have fabricated a toe guard for Commodore's casters. *Id.* at 174. It would have been impossible to design an appropriate guard without knowing the contours of the floor:

> Well, first of all, there's been some discussion about the undulation of the floor of the building where this is being manufactured; and if you have a guard and then try to—I believe Mr. Toney […] wanted it to be close to the floor obviously so that a toe or foot can't get underneath there; but because the floor goes up and down—which normally a floor would because it would have drains in it, because concrete is never made perfectly flat, because there are expansion joints and all those kinds of things, that if he put it too close to the floor, it would be a problem. And it would gouge into the floor. And if he put it, obviously, too high, it's not going to protect too many people unless they have a very big shoe on or something like that. So you'd have to know that information about the floor.

*Id.* at 175

Hutter believed Cass Hudson did not have the information it needed to make a safety recommendation, and was not aware that spotters and safety shoes were not in use, as its personnel never visited the plant. *Id.* at 212, 219. Hutter also stated that toe guards present their own risk of injury, including running over electric cords or hoses. *Id.* at 182. Hutter opined that toe guards did not pass his risk-utility analysis because they would not necessarily protect a worker's foot and they pose additional hazards. *Id.* at 196-97, 224-25. Hutter would not have recommended the use of a toe guard on the casters in question. *Id.* at 213. Hutter did not believe it was certain that a toe guard would have prevented Mr. Renninger's accident. *Id.*

at 191, 196. Mr. Renninger's soft tennis shoes could have slipped underneath a toe guard, depending on where he stood and the gap between the toe guard and the floor at that location. *Id.* at 196.

Hutter testified that utility carts used to carry thousands of pounds of steel, concrete, or brick generally do not have toe guards on the wheels. *Id.* at 187. Similarly, the industrial carts at retailers such as Home Depot do not have toe guards. *Id.* at 188. Hutter claimed the use of a spotter and safety shoes are the most successful methods of preventing the injury Mr. Renninger sustained. *Id.* at 192-93, 201-02. The toe of a typical safety shoe rises two inches above the sole, such that a caster would be unlikely to roll over the wearer's foot. *Id.* at 208. The wheel would bump the safety shoe and the wearer would have time to move his foot clear of the wheel's path. *Id.* at 208-09. Persons operating the machine that pushes the modular home are required to comply with government safety standards. *Id.* at 194. In sum, Hutter did not believe Cass Hudson supplied defective casters. *Id.* at 198. Hutter believed an unsafe workplace, rather than the lack of a toe guard, caused Mr. Renninger's injury. *Id.* at 198-99.

We now turn to Appellants' legal arguments. Appellants argue the trial court erred in denying their motion for a new trial or judgment notwithstanding the verdict ("JNOV"). "Our standard of review regarding a trial court's denial of a motion for a new trial is limited. The power to grant a new trial lies inherently with the trial court and we will not reverse its

decision absent a clear abuse of discretion or an error of law which controls the outcome of the case." **_Kaplan v. O'Kane_**, 835 A.2d 735, 737 (Pa. Super. 2003) (quoting **_Siegal v. Stefanyszyn, M.D._**, 718 A.2d 1274, 1275 (Pa. Super. 1998)). The following governs our review of the trial court's denial of JNOV:

> JNOV is the proper remedy in a civil case where the evidence presented at trial was insufficient to sustain the verdict. Nonetheless, JNOV is an extreme remedy which is properly entered by the trial court only in a case where, after viewing the evidence in the light most favorable to the verdict winner, the facts are so clear that no two reasonable minds could fail to agree that the verdict, as rendered by the jury, was improper. JNOV, however, may _not_ be employed to invade the province of the jury. Thus, when there is a question of fact to be resolved, it is within the sole purview of the jury. JNOV should not be entered where evidence is conflicting upon a material fact. Thus, where the jury has been presented with conflicting evidence, a motion for JNOV should be denied.

**_Rohm & Haas Co. v. Cont'l Cas. Co._**, 732 A.2d 1236, 1248 (Pa. Super. 1999) (emphasis in original), _affirmed_, 781 A.2d 1172 (Pa. 2001).

Appellants' first three assertions of error challenge the trial court's decision to admit evidence of industry safety standards, OSHA safety standards, and Mr. Renninger's alleged assumption of risk. "Questions concerning the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." **_B & L Asphalt Indus., Inc. v. Fusco_**, 753 A.2d 264, 270 (Pa. Super. 2000).

For many years, our law prohibited the introduction of industry standards evidence in a strict liability case, the rationale being that under § 402A of the Restatement (Second) of Torts,[7] "it is the product itself which is on trial, and not the manufacturer's conduct." ***Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.***, 580 A.2d 590, 593 (Pa. 1987). Industry standards evidence "improperly focuses on the quality of the defendant's conduct in making its design choice, and not on the attributes of the product itself." ***Id.*** at 594 (citing ***Lenhardt v. Ford Motor Co.***, 683 P.2d 1097

_____

[7] Section 402A provides:

§ 402A Special Liability of Seller of Product for Physical Harm to User or Consumer

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

> (a) the seller is engaged in the business of selling such a product, and

> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

> (a) the seller has exercised all possible care in the preparation and sale of his product, and

> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Restatement (Second) of Torts § 402A.

(Wash. 1984)). Furthermore, "if a manufacturer's product has design attributes which make it unsafe for its intended use, there is no relevance in the fact that such a design is widespread in the industry." *Id.*

In other words, *Lewis* espoused a strict separation between negligence principles and strict liability causes of action. The *Lewis* Court gleaned that principle from *Azzarello v. Black Bros., Co.*, 391 A.2d 1020, 1023 (Pa. 1978), which our Supreme Court in *Tincher* expressly overruled. *Tincher*, 104 A.3d at 335. Under *Azzarello*, the trial court decided, as a matter of social policy, whether a product was unreasonably dangerous, within the meaning of § 402A. *Id.* at 367. If the trial court found a product unreasonably dangerous, it submitted the case to a jury, which then determined whether plaintiffs proved the allegations in their complaint by a preponderance of the evidence. *Id.* The *Tincher* Court noted: "[f]ollowing *Azzarello*, decisional focus in strict liability cases shifted to reflect an increasing concern with segregating strict liability and negligence concepts." *Id.* The *Tincher* Court went on to discuss *Lewis* in detail, but it did not expressly overrule *Lewis*, or any case other than *Azzarello*. *See id.* at 368-69. The Supreme Court wrote:

> We recognize—and the bench and bar should recognize— that the decision to overrule *Azzarello* and articulate a standard of proof premised upon alternative tests in relation to claims of a product defective in design may have an impact upon other foundational issues regarding manufacturing or warning claims, and upon subsidiary issues constructed from *Azzarello,* such as the availability of **negligence-derived defenses**, bystander compensation, or the proper application of the intended use

- 15 -

doctrine. These considerations and effects are outside the scope of the facts of this dispute[.]

*Id.* at 409 (emphasis added).

Ultimately, the *Tincher* Court held that a plaintiff may show a defective condition by showing either that "(1) the danger is unknowable and unacceptable to the average or ordinary consumer, or that (2) a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions." *Id.* at 335. These tests present issues of fact for a jury, except where it is clear that reasonable minds cannot differ on an issue. *Id.*

Presently at issue in this design defect case is the second of these tests, known as the risk-utility test. Throughout its *Tincher* opinion, the Supreme Court noted that the risk-utility test is derived from negligence principles. Specifically, the Court quoted then-Justice Saylor: "In application to design defect claims, the concurrence […] observed, courts in Pennsylvania recognized 'an integral role for risk-utility (or cost-benefit) balancing, derived from negligence theory.'" *Id.* at 371 (quoting *Phillips v. Cricket Lighters*, 841 A.2d 1000 (Pa. 2003) (OAJC) (Saylor, J. concurring)); *see also id.* at 373-74 (quoting *Bugosh v. I.U. North Am., Inc.*, 971 A.2d 1228 (Pa. 2009) (Saylor, J., joined by Castille, C.J., dissenting)). Justice Saylor opined that a higher threshold of fault is appropriate in design defect cases, where a plaintiff's verdict suggests that an entire product line is defective. *Id.* Further, the Court noted that the

*Lewis* Court's distinction between negligence and strict liability principles was in "harmony" with *Azzarello*. *Id.* at 368.

Despite the Supreme Court's apparent recognition that the effects of *Tincher* would be far reaching, and despite its analysis of the negligence underpinnings of the risk-utility test Appellants rely upon in this case, Appellants largely sidestep the issue: "Nowhere in the *Tincher* decision did the Pennsylvania Supreme Court allow for the consideration of negligence principles in products liability cases." Appellants' Brief at 13. Appellants cite pages 399 and 410 of *Tincher* as evidence that the Supreme Court "specifically refused to adopt a theory of products liability which included negligence theory and principles." *Id.* at 15. On page 399 of *Tincher*, the court recognized the limits of Dean Wade's seven-part analysis, and recognizes the shortcomings of the risk-utility test. *Tincher*, 104 A.3d at 399. Nowhere does the Court state that negligence principles will not be relevant in a case where a plaintiff relies on risk-utility to establish a defective product. Likewise, on page 410, the *Tincher* Court explains some of its reasons for declining to adopt the Third Restatement. *Id.* at 410. Nothing on page 410 supports a conclusion that the *Tincher* Court intended to maintain a strict division between negligence and strict liability principles in the risk-utility test. Indeed, on the prior page (quoted above with emphasis added) the Supreme Court recognized that its holding could have

an impact on, among other things, the availability of negligence-based defenses. *Id.* at 409.

With this background, we now turn to the specifics of Appellants' argument. Appellants' filed a pretrial motion *in limine* seeking to exclude evidence of industry standards applicable to casters of the type at issue in this case and OSHA standards applicable to the Commodore plant where Mr. Renninger worked. The trial court denied the motion, reasoning that "[industry] standards may supply the jury with a useful starting point from which to evaluate the caster's design." Trial Court Opinion, 4/17/2015, at 21.[8] As described above, Appellee introduced evidence of ANSI standards governing casters. Hutter testified that no industry standard required the use of toe guards on casters. Appellee, through Hutter, also introduced evidence of OSHA violations at Commodore, and safety measures Commodore could have taken to prevent Mr. Renninger's injury, and evidence of Mr. Renninger's assumption of risk.

---

[8] Appellee argues in its brief that Appellants opened the door to industry standards evidence because their expert was the first to address it at trial. This argument is not well taken. After their unsuccessful motion *in limine*, Appellants had the right to devise an appropriate trial strategy. *See Sprague v. Walter*, 656 A.2d 890, 906 (Pa. Super. 1995) ("Having received an unfavorable ruling on its motion to exclude all such evidence, [the party] was entitled to use that evidence to its best advantage in order to try to win the case, and not be forced to wait for possible vindication of the trial court's adverse ruling.").

Surprisingly, Appellants do not address Hutter's discussion of industry standards governing casters, or even cite to portions of the record where Hutter offered that testimony. Appellants used the phrase industry standards in their question presented and again in their brief, but they confined the substance of their record citations and legal argument to the evidence of Commodore's conduct and OSHA violations.[9] Appellants' Brief at 12, 21. We will therefore do the same. ***See*** Pa.R.A.P. 2119(c) (requiring appellants to support arguments with pertinent citations to the record).

---

[9] This argument is consistent with Appellants' counsel's argument during the colloquy on the proposed points for charge:

> APPELLEE'S COUNSEL: We do request 25 and 26 or an amalgam of the two so that they realize it is relevant to consider the industry standards that they've heard about. It's not a dispositive, but it's relevant as to whether or not a seller acted reasonably.

> APPELLANTS' COUNSEL: Compliance with industry standards, you were talking about industry standards with regard to workplace not with regard to the product.

> APPELLEE'S COUNSEL: No. We talked about it with regard to the product too. It doesn't violate any industry standards. That was pretty clearly said by Dr. Hutter.

> APPELLANTS' COUNSEL: No.

> APPELLEE'S COUNSEL: No, it wasn't.

> APPELLANTS' COUNSEL: He covered employer employer employer.

N.T. Trial, 6/25/2015 a.m., at 30-31.

Concerning Commodore's conduct, and the alleged OSHA violations, Appellants cite three specific portions of the trial transcript. Appellants' Brief at 12, 21. First, at pages 178 through 181 of the June 24, 2015 transcript, Hutter discussed the lack of safety shoes, trained industrial truck operators, and spotters, the uneven floor, and other potential hazards at the Commodore plant. N.T. Trial, 6/24/15, at 178-81. Hutter also explained his reasons for opining that a toe guard would not necessarily prevent the type of injury Mr. Renninger sustained. *Id.*

Next, Appellants cite pages 191 to 196 of the June 24, 2015 transcript. Appellants' Brief at 12, 21. On these pages, Hutter further elaborated on his reasons for believing a toe guard would not necessarily prevent a foot injury. N.T Trial, 6/24/15, at 191-92, 195-96. Likewise, Hutter further elaborated on his opinion that Commodore failed to provide proper supervision and footwear. *Id.* at 193. Hutter stated that Commodore was cited for an OSHA violation as a result of these deficiencies. *Id.* at 193-195.

Finally, Appellants cite pages 198-99 of the June 24, 2015 transcript, wherein Hutter testified that Mr. Renninger's injury was a result of Commodore's OSHA violations and Mr. Renninger's own negligence. Appellants' Brief at 12, 21; N.T. Trial, 6/24/15, at 198-99. As noted above, in none of these portions of the transcript did Hutter reference industry standards applicable to casters.

Appellants rely in part on **Sheehan v. Cincinnati Shaper Co.**, 555 A.2d 1352 (Pa. Super. 1989), *appeal denied*, 564 A.2d 1261 (Pa. 1989). In **Sheehan**, as in the instant case, the defendant argued that the plaintiff's employer's OSHA violations were relevant to causation. The defendant sold a shear to the plaintiff's employer and argued that OSHA regulations required the employer to provide safety guards for use with the shear. **Id.** at 1354. We rejected the defendant's argument:

> Although Shaper attempts to couch its argument in terms of causation, it fails to explain how OSHA standards are relevant to that issue. The essence of Shaper's argument is that Shaper acted reasonably by designing the shear without a safety guard since OSHA standards place the responsibility of providing a safety guard on the buyer/employer.
>
> [***]
>
> We conclude that the OSHA regulations proffered would introduce into a strict liability action the reasonableness of Shaper's failure to provide the new safety device for this machine, an issue irrelevant to whether liability attaches. Accordingly, the trial court did not err by sustaining Sheehan's objections to the introduction of this evidence.

**Id.** at 1354-55. Thus, the **Sheehan** Court employed the strict separation between negligence and strict liability, set forth in **Lewis** in "harmony" with **Azzarello**. **See Tincher**, 104 A.3d at 368 (discussing **Lewis** and **Azzarello**).

Likewise, Appellants cite **Majdic v. Cincinnati Mach. Co.**, 537 A.2d 334 (Pa. Super. 1988) (*en banc*), to support their argument that a plaintiff's employer's conduct is not relevant in a strict products liability action. The

plaintiff operated a power press used for "the punching, stamping, bending, or sheering of metal." *Id.* at 336. There, the defendant provided a press brake, which plaintiff's employer then incorporated into its manufacturing system. *Id.* at 336-37. Plaintiff alleged the press brake was defective because "it did not contain a guard which would have prevented the operator's hands from entering the point of operation." *Id.* at 336. The defendant argued that "the press brake was a general purpose, multifunctional unit which was unequipped with dies and had no point of operation when sold." *Id.* at 337. Thus, "only [plaintiff's employer], which incorporated the press brake into its manufacturing system, could determine and install the guards and warnings necessary for the particular function assigned to the press." *Id.* The defendant introduced evidence of ANSI standards for power presses and evidence that it was industry custom for the purchaser of a press brake to provide the necessary safety devices. *Id.* at 338. Citing *Lewis*, decided the year before *Majdic*, the *Majdic* Court held that the trial court erred in permitting the ANSI evidence and evidence of industry custom. *Id.* at 338-39. The *Majdic* Court rejected such evidence because it implicated the reasonableness of the manufacturer's conduct.

Appellants do not address whether *Tincher* has any implications for the continued vitality of *Sheehan* or *Majdic*. Assuming without deciding that the trial court erred in admitting evidence of Commodore's conduct

under those two cases, we conclude the trial court's error was harmless. "To constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining." **B & L Asphalt Indus., Inc.** 753 A.2d at 270. "An evidentiary ruling which did not affect the verdict will not provide a basis for disturbing the [fact-finder]'s judgment." **Id.** 270-71.

The trial court instructed the jury that Commodore's conduct was relevant only if the jury deemed it a superseding cause of Mr. Renninger's accident. N.T. Trial, 6/25/2015 p.m., at 15; Verdict Slip, Question 3. We presume that juries follow the trial court's instructions. **Maya v. Johnson and Johnson**, 97 A.3d 1203, 1222 (Pa. Super. 2014), *appeal denied*, 112 A.3d 653 (Pa. 2015). Question one on the verdict slip asked the jury whether the caster was defective. Question three on the verdict slip asked the jury to assess whether Commodore's or Mr. Renninger's conduct was a cause of the accident. The jury answered question one in the negative, and therefore left question three blank. Given the foregoing, we will presume that the jury did not consider the evidence of Commodore's conduct or Mr. Renninger's alleged assumption of risk.

In addition, the record contains a significant body of evidence supporting the jury's verdict. As we have already explained, the jury had before it Appellee's introduction of ANSI standards governing casters, which Appellants have not challenged on appeal. Further, the jury had before it

Appellee's evidence that toe guards would not have protected Mr. Renninger, given the uneven flooring in Commodore's plant. The jury also had before it Appellee's evidence that toe guards would pose risks such as severing electric cords draped across the floor. Given all of this evidence, and given the trial court's instruction that Commodore's and Mr. Renninger's conduct[10] was relevant only to causation, we conclude that any error in admitting evidence of Commodore's conduct was harmless.

We pause here to address the parties' arguments under *Tincher*. Appellants take a very narrow reading of *Tincher*, seemingly concluding that it overruled *Azzarello* but did little else. Even a cursory reading of *Tincher* belies that argument. The Supreme Court's opinion in *Lewis*, providing for a strict separation between negligence and strict liability, was, according to the *Tincher* Court, a result in harmony with *Azzarello*. The *Tincher* Court, as we have explained, did not expressly overrule *Lewis*, and had no occasion to do so based on the arguments the parties presented to it. The *Tincher* Court did anticipate that its holding would have significant ripple effects to be addressed case by case as they arise:

> This Opinion **does not purport to either approve or disapprove prior decisional law**, or available alternatives suggested by commentators or the Restatements, relating to

---

[10] The parties disputed the admissibility of Mr. Renninger's alleged assumption of risk under *Reott v. Asia Trend, Inc.*, 55 A.3d 1088 (Pa. 2012) and/or *Clark v. Bil-Jax, Inc.*, 763 A.2d 920 (Pa. Super. 2000), *appeal denied*, 782 A.2d 541 (Pa. 2001).

> foundational or subsidiary considerations and consequences of our explicit holdings. In light of our prior discussion, the difficulties that justify our restraint should be readily apparent. The common law regarding these related considerations should develop within the proper factual contexts **against the background of targeted advocacy.**

*Tincher*, 104 A.3d at 410 (emphasis added).

Ordinarily, this Court is bound by Supreme Court precedent, as well as the published decisions of prior *en banc* and three-judge panels of this Court. In the wake of *Tincher*, however, the bench and bar must assess the *Tincher* opinion's implications for a large body of post-*Azzarello* and pre-*Tincher* case law.

In this case, Appellee argues that the *Tincher* Court's reliance on California case law, particularly *Barker v. Lull Engineering Co.*, 573 P.2d 443 (Ca. 1978) reveals the Supreme Court's intent to admit evidence of industry standards because California does so. Appellee's Brief at 12-13. In fact, admission of industry standards evidence is still in controversy in California, and the issue is currently pending before the California Supreme Court. *Kim v. Toyota Motor Corp.*, 197 Cal. Rptr. 3d (Cal. Ct. App. 2016), *review granted and opinion superseded*, 368 P.3d 311 (Cal. 2016).

In *Kim*, the plaintiffs filed a motion *in limine* to preclude evidence of industry custom and practice concerning the design of their 2005 Toyota Tundra pickup truck. *Id.* at 652. Plaintiffs argued that electronic stability control ("ESC") could have prevented their accident. Toyota's product manager acknowledged that Toyota engineers recommended making ESC

standard on the 2005 Tundra. *Id.* at 653. Toyota instead offered it as an option, noting that no other manufacturer of full-size pickup trucks offered ESC as a standard feature in 2005. *Id.* The *Kim* Court noted two lines of California case law arriving at different conclusions on the admissibility of industry standards evidence, and devised a middle ground approach. *Id.* at 655-61. The California Supreme Court has yet to render a decision in *Kim*.

*Kim* is illustrative of some of the competing arguments for and against industry standards evidence in strict products liability/design defect cases. Other states, including Illinois, hold that evidence of a product's compliance with industry standards is relevant, but not a complete defense. *See Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1154 (Ill. 2011). Neither party to the instant appeal has offered any substantive argument for or against the admission of such evidence in Pennsylvania after *Tincher*. Given the arguments before us, we do not have occasion to express an opinion. In light of all of the foregoing, Appellants' first three arguments do not merit relief.

Appellants' next three assertions of error address the trial court's jury instruction.

> We will reverse for improper jury instructions only where the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. […] We will not reverse for isolated inaccuracies; the charge as a whole must be shown to have caused prejudicial error. Thus, to constitute reversible error, a jury instruction must be erroneous and harmful to the complaining party.

*Schaaf v. Kaufman*, 850 A.2d 655, 666 n.10 (Pa. Super. 2004) (internal citations and quotation marks omitted).

Appellants argue that the trial court erred in instructing the jury on the so-called "Dean Wade" factors.[11] Dean Wade developed seven factors relevant to application of the risk-utility theory of recovery. The ***Tincher*** Court referenced the Dean Wade test, noted its limitations, and did not expressly adopt it. ***Tincher***, 104 A.3d at 389-90. As both the trial court and Appellee note, Appellants failed to object to the jury instruction in question. Appellants' do not cite the place of preservation of this issue in accord with Pa.R.A.P. 2117(c), and our review of the transcript does not reveal any specific objection to a charge containing the seven Dean Wade factors. Appellee's proposed points for charge number 22 included six of the Dean Wade factors, and when the parties addressed that point the trial court simply noted it was covered in the court's risk utility instruction. N.T. Trial, 6/25/2015 a.m., at 30. The Dean Wade factors were mentioned during the colloquy, but it is not clear that Appellants' objected to a charge containing the seven factors. ***Id.*** at 29. At the conclusion of its charge, the trial court offered the parties the opportunity to raise "any matters concerning the charge" and Appellants offered nothing. N.T. 6/25/2015 p.m., at 27. As such, they have waived this argument. "Objections to jury instructions must

---

[11] Dean John W. Wade was the Dean of Vanderbilt Law School and a widely cited expert on tort law.

- 27 -

be made before the jury retires to deliberate, unless the trial court specifically allows otherwise. Pa.R.C.P. [No.] 227(b)." **Passarello v. Grumbine**, 87 A.3d 285, 292 (Pa. 2014). "[W]here a party fails to specifically object to a trial court's jury instruction, the objection is waived and cannot subsequently be raised on appeal." **Cruz v. Ne. Hosp.**, 801 A.2d 602, 610–11 (Pa. Super. 2002) (quoting **Randt. v. Abex Corp.**, 671 A.2d 228, 232 (Pa. Super. 1996)). Furthermore, Appellants' brief does not address any particular factor or factors and explain how it prejudiced their case.

Next, Appellants argue the sequencing of the trial court's instructions was erroneous because it permitted the jury to reach a decision on product defect without considering the risk-utility test. Once again, the record reveals that Appellants failed to lodge a timely objection.

In their sixth assertion of error, Appellants claim the trial court erred in declining to instruct the jury on the intended-use doctrine. The parties dispute whether the intended use doctrine—which holds that a product must be safe for its intended use by its intended user—applies after **Tincher**. Instantly, there is nothing to suggest that Mr. Renninger's injury occurred during an unintended use of the caster, or that the persons moving the home along the plant floor were unintended users. To the extent they believe the alleged conduct of Commodore and/or Mr. Renninger was offered as evidence of an unintended use of the caster (**see** Appellants' Brief at 14-

15), we have already explained that the jury never considered that evidence. As noted above, Appellants cannot obtain relief unless they demonstrate that the trial court's instruction was erroneous and harmful. Appellants have not explained how the court's instruction harmed their case, and that omission is fatal to this argument.

Finally, Appellants argue that the trial court erred in entering summary judgment on Appellants' failure to warn and manufacturing defect causes of action. Appellants' argument on this point is puzzling, in that Appellants address an evidentiary dispute as to which party was responsible for the **design** of the caster assembly. Appellants' Brief at 23-24. Appellants fail to explain how this evidentiary dispute was relevant to their failure to warn and manufacturing defect claims, or precisely why the trial court erred in entering summary judgment on those claims. This argument does not merit relief.

In summary, we have concluded that none of Appellants' assertions of error merits relief. We therefore affirm the judgment.

Judgment affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/11/2017