J-S20001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| CRYSTAL JACKSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RICHARD WILLIAMS | : | |
| | : | |
| Appellant | : | No. 56 WDA 2022 |

Appeal from the Order Dated December 13, 2021
In the Court of Common Pleas of Fayette County Civil Division at No(s):
1623 of 2021

BEFORE:  NICHOLS, J., MURRAY, J., and KING, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED: AUGUST 2, 2022**

Appellant Richard Williams appeals from the order granting Appellee Crystal Jackson's petition for a final protection from abuse order under the Protection From Abuse (PFA) Act.[1]  Appellant argues that the trial court erred in allowing Appellee to introduce electronic communications into evidence that had not been properly authenticated.  We affirm.

By way of background, Appellant and Appellee were in a relationship for sixteen years[2] and have three children together.  N.T., 12/13/21, at 5-6. Appellant and Appellee separated in 2019 and Appellant moved out of the home they shared.  *Id.* at 6.

_____

[1] 23 Pa.C.S. §§ 6101-6122.

[2] Appellant and Appellee are not married.  N.T. at 6.

Appellee filed a PFA petition on her behalf that included the parties' three minor children on September 8, 2021. That same day, the trial court issued a temporary PFA order. On December 13, 2021, the trial court held a final PFA hearing, at which both parties were represented by counsel.

At the PFA hearing, Appellee testified about an incident that occurred in February of 2021 when Appellant came to Appellee's house. *Id.* at 6-7. After Appellee let Appellant into her home, Appellant began yelling and refused to leave, even after Appellee told him to go. *Id.* at 7. Appellant threatened to harm himself, got a steak knife from the kitchen, and held it against his neck. *Id.* at 7-8. One of the parties' children came downstairs. *Id.* at 8. Appellee told their son to call 911, and Appellant chased their son up the stairs while still holding the knife. *Id.* Appellee followed, and after a struggle, Appellant went back downstairs. Appellee and her son tried to barricade themselves in a bedroom with the other children. *Id.* at 9.

Appellant returned upstairs and pushed the bedroom door open. *Id.* at 10. Appellant demanded that Appellee and the children come into another room and talk with him, or he would kill himself. *Id.* Appellee and the children complied. *Id.* While his children watched, Appellant yelled and cut his arms with the knife. *Id.* at 10-11. Appellee cried and screamed for Appellant to stop. *Id.* at 11. Appellee was concerned for her safety and that of her children. *Id.*

A neighbor entered the house and yelled from downstairs asking what was happening. *Id.* at 11-12. Appellant told Appellee to tell the neighbor to

- 2 -

leave.  *Id.* at 11.  Appellee did not do so because she was scared.  *Id.* at 11-12.  Appellant ran downstairs and started fighting with the neighbor.  *Id.* at 12.  Appellee again barricaded herself in a room with the children and called 911.  *Id.*  Appellee came out of the room after the police arrived.  *Id.* at 13.  Appellee saw her neighbor in an ambulance with a stab wound in his arm.  *Id.*  Appellee did not see Appellant stab the neighbor.  *Id.* at 27.  Appellant was eventually arrested after this incident.  *Id.* at 21.

Appellee testified that after the incident in the house, Appellant began attempting to contact her via social media.  *Id.* at 13-14.  Appellee explained that although she blocked Appellant from contacting her, Appellant used other people's phones to send her messages.  *Id.* at 14-15.  Appellee also stated that she believed Appellant created a new Facebook account.  *Id.*  At the hearing, Appellee presented a copy of Facebook posts from an account with the name "Richie Williams" as Exhibit 1.  *Id.* at 15; *see also* Appellee's Ex. 1.  Appellee stated that she believed that Appellant authored those posts because they were made "right after" the incident at her home.  N.T. at 15.  The posts included statements such as "God please please im begging u let me get my hands on a gun soon" and "whore always a whore."  Appellee's Ex. 1 (verbatim).

Appellee also presented a copy of another Facebook post from the Richie Williams account as Exhibit 2.  N.T. at 17.  That post stated: "When i cave your skull in and your damaged for life i tried to tell u two."  Appellee's Ex. 2 (verbatim).  Appellee testified that the tone of the posts in these exhibits was

consistent with other posts that she saw from the Richie Williams account. N.T. at 17-18. Although Appellee acknowledged that none of these posts were directed at a specific person, she believed that they were directed to her. *Id.* at 16.

Appellee next submitted a series of text messages and photos that she received on August 6, 2021, from a contact saved in her phone as "Rwill." *Id.* at 18-19; *see also* Appellee's Ex. 3. In the text messages, the sender accused Appellee of wanting to ruin the sender's life and of being "ignorant and cruel and backstabbing" towards the sender. Appellee's Ex. 3. The photographs depict a bloodied male forearm that was cut multiple times. N.T. at 18-20; Appellee's Ex. 3, 4, and 5. One photo depicts a man's face holding a cell phone. Appellee's Ex. 3. Immediately following her receipt of these photos, she received text messages stating: "Here's goes another[,]" Appellee's Ex. 4 (verbatim), and "F*** it tried five Times dude I'm doing it twice for every time you don't answer the f****** phone[,]" "That ten more[,]" and "Answer the damn phone Jesus Chris[.]" Appellee's Ex. 5 (verbatim).[3] Appellee stated that these messages made her feel scared. N.T. at 20.

Appellee testified that she was familiar with the telephone number sending the text messages and that it may have been the number for a phone that she had given to Appellant in the past. *Id.* at 24-25. However, Appellee stated that Appellant had "a couple" of different phones. *Id.* at 25. She also

---

[3] Appellee's Exhibit 5 is labeled as "П6", *i.e.*, Appellee's Exhibit 6, but was introduced at the hearing as Appellee's Exhibit 5. N.T. at 19.

identified Appellant's face in some of the pictures and recognized the bloody arm from the photos as Appellant's arm. *Id.* at 24, 29-30. Further, Appellee described previous incidents involving Appellant when he yelled at her, shoved her, and pulled her down the stairs while she was holding one of their children. *Id.* at 21-22.

Appellee moved to admit these exhibits, but Appellant objected to their admission. *Id.* at 23. Appellant argued that Appellee did not see the messages being sent, and that, therefore, Appellee had not established an adequate foundation to prove that Appellant was the author of the messages. *Id.* at 27. The trial court overruled Appellant's objections and admitted all of Appellee's exhibits into evidence. *Id.* at 28-30. Appellant did not testify and did not call any witnesses.

At the conclusion of the hearing, the trial court found Appellee to be credible and referred to Appellee's Exhibit 3 in its findings of facts. *Id.* at 30-31. The trial court granted the final PFA order which prohibited Appellant from contacting Appellee for three years and awarded Appellee primary physical custody of the parties' three minor children. Final PFA Order, 12/13/21, at 3-5 (unpaginated).

On January 7, 2021, Appellant filed a timely notice of appeal. Appellant subsequently filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a Rule 1925(a) opinion addressing Appellant's claim.

On appeal, Appellant raises the following issue for our review:

> Whether the trial court erred as a matter of law, and committed an abuse of discretion, in admitting and considering five (5) exhibits containing text messages, purportedly sent by Appellant, when there was not sufficient evidence, either by sufficient direct or circumstantial evidence, that the messages were sent by Appellant?

Appellant's Brief at 4.

Appellant argues that the trial court abused its discretion in admitting Appellee's exhibits because Appellee only offered circumstantial evidence to establish that Appellant was the author of those messages. *Id.* at 7-9. Appellant asserts that "'mere confirmation that the number or address [of the sender] belonged to a particular person[]'" is insufficient to authenticate electronic communications. *Id.* at 7 (quoting **Commonwealth v. Koch**, 39 A.3d 996, 1005 (Pa. Super. 2011)). Appellant also contends that while circumstantial evidence can sometimes be used to authenticate electronic communications, the evidence in the instant case was "so unreliable and questionable" that the trial court erred in admitting Appellee's exhibits over Appellant's objection. *Id.* at 9.

"Our standard of review for PFA orders is well settled. In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion." **Boykai v. Young**, 83 A.3d 1043, 1045 (Pa. Super. 2014) (citation omitted). Further, "[t]his Court defers to the credibility determinations of the trial court as to witnesses who appeared before it." **K.B. v. Tinsley**, 208 A.3d 123, 128 (Pa. Super. 2019) (citation omitted).

This Court has explained:

> The admission or exclusion of evidence is within the sound discretion of the trial court, and in reviewing a challenge to the admissibility of evidence, we will only reverse a ruling by the trial court upon a showing that it abused its discretion or committed an error of law[.] A trial court has wide discretion in ruling on the relevancy of evidence and its ruling will not be reversed absent an abuse of discretion.

*K.T. v. L.S.*, 118 A.3d 1136, 1165 (Pa. Super. 2015) (citation omitted). "An evidentiary ruling which did not affect the verdict will not provide a basis for disturbing the [fact-finder]'s judgment." *Renninger v. A & R Mach. Shop*, 163 A.3d 988, 999 (Pa. Super. 2017) (citation omitted).

Further, this Court has stated that "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or unduly prejudicial to the complaining party." *K.B.*, 208 A.3d at 130 (citation omitted and formatting altered).

With respect to the authentication of evidence, Rule of Evidence 901 provides, in pertinent part, as follows:

> **(a) In General.** To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.
>
> **(b) Examples.** The following are examples only—not a complete list—of evidence that satisfies the requirement:
>
> * * *
>
> *(11) Digital Evidence.* To connect digital evidence with a person or entity:
>
>> (A) direct evidence such as testimony of a person with personal knowledge; or
>>
>> (B) circumstantial evidence such as:

(i) identifying content; or

(ii) proof of ownership, possession, control, or access to a device or account at the relevant time when corroborated by circumstances indicating authorship.

Pa.R.E. 901(a), (b)(11).

Further, the Comment to Rule 901 explains:

"Digital evidence," as used in this rule, is intended to include a communication, statement, or image existing in an electronic medium. This includes emails, text messages, social media postings, and images. The rule illustrates the manner in which digital evidence may be attributed to the author.

The proponent of digital evidence is not required to prove that no one else could be the author. Rather, the proponent must produce sufficient evidence to support a finding that a particular person or entity was the author.

\* \* \*

Circumstantial evidence of identifying content under Pa.R.E. 901(b)(11)(B)(i) may include self-identification or other distinctive characteristics, including a display of knowledge only possessed by the author. Circumstantial evidence of content may be sufficient to connect the digital evidence to its author.

Circumstantial evidence of ownership, possession, control, or access to a device or account alone is insufficient for authentication of authorship of digital evidence under Pa.R.E. 901(b)(11)(B)(ii). *See, e.g.*, ***Commonwealth v. Mangel***, 181 A.3d 1154, 1163 (Pa. Super. 2018) (social media account bearing defendant's name, hometown, and high school was insufficient to authenticate the online and mobile device chat messages as having been authored by defendant). However, this evidence is probative in combination with other evidence of the author's identity.

Pa.R.E. 901, Cmt (some citations omitted).

In ***Mangel***, the Commonwealth filed a motion *in limine* seeking to introduce Facebook posts and messages allegedly authored by the defendant

- 8 -

in an aggravated assault case. *Mangel*, 181 A.3d at 1155-57. In support of its motion, the Commonwealth presented testimony from an officer who stated that the Facebook account listed the defendant's name, hometown, and school. *Id.* at 1156-57. Ultimately, the trial court concluded that the officer's testimony was insufficient to corroborate the Commonwealth's claim that the defendant was the author of the Facebook communications in question. *Id.* at 1157.

On appeal, this Court affirmed. In reaching that conclusion, the *Mangel* Court explained:

> [T]he Commonwealth presented no evidence, direct or circumstantial, tending to substantiate that [the defendant] created the Facebook account in question, authored the chat messages, or posted the photograph of bloody hands. The mere fact that the Facebook account in question bore [the defendant's] name, hometown and high school was insufficient to authenticate the online and mobile device chat messages as having been authored by [the defendant]. Moreover, there were no contextual clues in the chat messages that identified [the defendant] as the sender of the messages.

*Id.* at 1164.

In *Commonwealth v. Murray*, 174 A.3d 1147 (Pa. Super. 2017), the defendant was arrested after he admitted to possessing a firearm during an altercation with his housemate, which constituted a violation of his parole. *Murray*, 174 A.3d at 1151 (citation omitted). After the defendant was taken into custody, the parole agent reviewed the defendant's phone and found text messages indicating where the defendant had hidden the gun. *Id.* The probation officer then searched the defendant's residence and located the gun

in the location described in the text messages. *Id.* After the defendant was charged with firearms possession by a prohibited person, the Commonwealth sought to introduce the defendant's text messages into evidence. The trial court concluded that "the text messages in question were properly authenticated based on the contextual clues in the messages and the fact that [the parole officer] retrieved the phone from [the defendant's] person." *Id.* at 1157. On appeal, this Court affirmed. *Id.*

In the instant case, the trial court granted Appellee's request to introduce text messages and Facebook posts that were allegedly written by Appellant. In its Rule 1925(a) opinion, the trial court explained:

> Exhibit 1 is a copy of a Facebook post that bears the name of "Richie Williams," with a profile photo of Appellant. It states: "God please please im begging u let me get my hands on a gun soon." [Appellee's] Ex. 1 [(verbatim)]. [Appellee] testified that the post was made "right after the incident at the house." The post was also one of a string of dozens of posts bearing Appellant's name and picture.
>
> Exhibit 2 is a copy of a Facebook post that states: "When I cave your skull in and your damaged for life I tried to tell u two." [Appellee's Ex. 2 (verbatim)]. [Appellee] testified that these messages were typical in tone for the majority of posts she saw. This too was a post with the Appellant's name and picture.
>
> Exhibits 3 through [5] are copies of text messages and photographs received by [Appellee] on August 6 and captured on her phone under the contact "Rwill." The photographs show a progression of a bloodied male forearm that has been sliced open an increasing number of times. One message interrupts the photographs and states: "Here's goes another." [Appellee's Ex. 5 (verbatim)]. Another states: "F*** it tried five Times dude I'm doing it twice for every time you don't answer the f****** phone." [Appellee's Ex. 5 (verbatim)].

- 10 -

[Appellee] testified that she was familiar with the telephone number sending the text messages. She also identified the Appellant's forearm from the photos and testified that such behavior was typical for the Appellant when he attempted to get her to talk to him. [Appellee's] testimony as to Appellant's use of a knife to harm himself and to threaten others demonstrates this behavior was a key characteristic of the events of February 2021.

This court reviewed each exhibit individually with both parties' counsel, and admitted all five into evidence, noting that appropriate weight would be assigned to them.

Ultimately, this court found [Appellee's] testimony to be credible and, in announcing its decision, specifically referenced only Exhibit 3 and noted that it had been properly authenticated. The credible testimony and single exhibit alone were sufficient to reach a decision to grant the final PFA. However, in considering the authenticity of the other exhibits, this court did not rely solely upon evidence of Appellant's "ownership, possession, control, or access to a device or account." Instead, for each exhibit, either [Appellant's] photo and name were displayed, his arm was positively identified, and/or the content of the posts and texts was related to the interactions and experiences of [Appellee] and Appellant in such a way as supported a finding that he was the author.

Trial Ct. Op., 2/18/22, at 4-5 (some citations omitted and formatting altered).

Based on our review of the record, we discern no abuse of discretion by the trial court in allowing Appellee to introduce the text messages and photographs as evidence at trial. *See K.T.*, 118 A.3d at 1165. As discussed, Appellee testified that Appellant cut himself in Appellee's presence, she recognized the sender's phone number as one that belonged to Appellant, and she identified Appellant's face and his bloody arm in the pictures. Further, the trial court found Appellee's testimony credible. *See K.B.*, 208 A.3d at 128 (stating that this court "defers to the credibility determinations of the trial court"). Therefore, we agree with the trial court that Appellee presented

sufficient circumstantial evidence to establish that Appellant was the author of those messages. *See* Pa.R.E. 901(a), (b)(11); *Murray*, 174 A.3d at 1157.

Additionally, we conclude that the trial court did not abuse its discretion in admitting the Facebook posts contained in Appellee's Exhibits 1 and 2. *See K.T.*, 118 A.3d at 1165. Appellee testified that after she blocked Appellant from contacting her, including on Facebook, she saw Facebook posts from the "Richie Williams" account, which she believed was a new account that Appellant created. *See* N.T. at 14-15. Unlike the Facebook posts at issue in *Mangel*, which lacked any date stamps to link them to the date of the assault, Appellee described these posts as having been made shortly after the incident with Appellant in her home. *See id.* at 15; *cf. Mangel*, 181 A.3d at 1163. Further, Appellee testified that the tone of the posts, which contained threats of violence, was similar to the tone of other messages from Appellant. *See* N.T. at 17-18. In *Mangel*, the Commonwealth attempted to authenticate the Facebook posts that the defendant allegedly wrote with the testimony of police officers who were not witnesses to the incident described in those posts. Here, Appellee was in a sixteen-year relationship with Appellant, and she witnessed Appellant's attempted assault of their son and his violent acts of self-harm in front of their children. *Cf. Mangel*, 181 A.3d at 1156-57. On this record, we conclude that Appellee presented sufficient circumstantial evidence to establish that Appellant was the author of those Facebook messages, and that the trial court did not err in admitting them. *See Murray*, 174 A.3d at 1157; Pa.R.E. 901(b)(11)(A)(ii) (providing that digital evidence may be

authenticated by circumstantial evidence that a person had control or access to an account at the relevant time, corroborated by circumstances indicating authorship).

Further, the trial court credited Appellee's testimony regarding her violent encounter with Appellant in February of 2021, as well as previous incidents of abuse. *See* N.T. at 7-13, 21-22. The trial court also relied on Exhibit 3, which depicted threatening messages that Appellant sent to Appellee's phone and several pictures of Appellant's bloody arm. *See* Appellee's Exhibit 3. Accordingly, on this record, the evidence of abuse was overwhelming, and no relief is due to Appellant.

For these reasons, viewing the evidence in the light most favorable to Appellee, we conclude that there was sufficient evidence to support the PFA order. *See K.B.*, 208 A.3d at 128 (explaining that "the court's objective is to determine whether the victim is in reasonable fear of bodily injury"). Accordingly, we affirm. *See K.B.*, 208 A.3d at 130; *Boykai*, 83 A.3d at 1045.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/2/2022