J-A04035-21

2021 PA Super 66

| | | |
|---|---|---|
| MICHAEL AND MELISSA SULLIVAN, H/W | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WERNER COMPANY AND LOWE'S COMPANIES, INC., AND MIDDLETOWN TOWNSHIP LOWE'S STORE #1572 | : | No. 3086 EDA 2019 |
| | : | |
| APPEAL OF: WERNER COMPANY AND LOWE'S COMPANIES, INC., | : | |

Appeal from the Judgment Entered November 19, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 161003086

BEFORE:  STABILE, J., KING, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                    **FILED APRIL 15, 2021**

Michael Sullivan (Sullivan) and Melissa Sullivan, his wife, brought this strict products liability action after he fell through a scaffold made by Werner Company (Werner) and sold by Lowe's Companies, Inc. (Lowe's) (collectively, Manufacturer).  A jury determined that a design defect caused the accident and awarded Sullivan $2.5 million in damages.  On appeal, Manufacturer raises three challenges.  First, Manufacturer alleges that the trial court erred in precluding industry standards evidence.  Second, Manufacturer asserts that it should have been allowed to argue that Sullivan's negligence was the sole

_____

* Retired Senior Judge assigned to the Superior Court.

cause of the accident. Third, Manufacturer challenges Sullivan's mechanical engineering expert, arguing that both his opinion testimony and videotaped testing lacked a proper factual foundation. We affirm.

**I.**

**A.**

The scaffold that was alleged defective is the Werner SRS-72, a six-foot tall steel rolling scaffold. It has two end frames, two side rails, a steel-encased plywood platform, and four locking caster wheels. To assemble the frame, the user attaches the side rails to the end frames. Once attached, the side rails and end frames create a frame for the platform to rest in. The user seats the platform in the frame by placing it on horizontal flanges on the side rails. When fully seated, the platform should be flush with the top of the side rails.

The user then secures the platform to the frame with two deck pins - one on each side diagonal from the other. With an inverted L-shape design, the deck pins cover the platform. To secure the platform, the user pushes the spring-loaded deck pins up and rotates them so that their upper parts cover the platform. When fully rotated, the deck pins protect the platform against upward force. Finally, with the platform secured, the user attaches the wheels to the end frames. When the wheels are unlocked, the user can roll the scaffold to his work area. After locking the wheels, the user climbs the rungs on the end frames to get on the platform and work.

The accident happened on June 26, 2015. On that day, Sullivan was working as a union carpenter at a Bucks County elementary school being renovated. Along with his apprentice Michael Bentzley (Bentzley), Sullivan's job that day was to install an exterior sheathing called DensGlass to the outdoor walls. Sullivan went to the work site's container box and retrieved a brand-new Werner SRS-72 scaffold that his foreman bought at a Lowe's store. As a carpenter with 17 years' experience, Sullivan had assembled "hundreds" of scaffolds. Sullivan took the scaffold out of the box, read the instructions and assembled the scaffold with help from Bentzley. After setting the scaffold at its tallest height of six feet, Sullivan placed the platform within the side rails and rotated the deck pins to secure the platform. Sullivan and Bentzley then rolled the scaffold through the school, down a ramp and over outdoor asphalt to the wall where they would be working.

At the wall, Sullivan did not need the scaffold to install the bottom two rows of DensGlass pieces, which were eight-by-four feet and about 40 pounds per piece. Sullivan, however, needed the scaffold to install the top row. After placing the scaffold six inches from the wall, he climbed the rungs to get on the platform and take measurements because the DensGlass pieces were too big for the top row. Sullivan then relayed the measurements to Bentzley at a nearby cutting station. Bentzley would cut the pieces based on the measurements, walk the pieces to the scaffold, rest them on the platform,

and then slide them up to Sullivan. Sullivan then lifted up the pieces and installed them to the wall with a screw gun.

Sullivan installed the first two pieces with no problems. Each time, he installed the piece, climbed off the platform, unlocked the wheels, rolled the scaffold about eight feet to the next section, relocked the wheels and then climbed back up on the platform. While installing the third piece, Sullivan fell through the scaffold and crashed to the ground, landing on his backside. At trial, Sullivan testified the platform collapsed beneath him like a "trapdoor." Bentzley heard the crash and rushed over to find a dazed Sullivan laying under the scaffold. The foreman also came and saw the same thing. Sullivan told him that he "fell through the scaffold, that the scaffold plank gave way."

Despite the accident, Sullivan got up after a few minutes and continued working on the scaffold. Later that night, however, he went to the hospital. X-rays revealed that he injured his lumbar vertebrae and fractured his sacrum. Having suffered permanent injuries requiring continual medical treatment, Sullivan has been unable to return to work as a carpenter since the accident.

**B.**

Sullivan, together with his wife, filed this action in the Court of Common Pleas of Philadelphia County (trial court) against Manufacturer.[1] Sullivan asserted claims for negligence (later withdrawn at trial) and strict products

---

[1] Sullivan's wife asserted a consortium claim that did not succeed at trial.

liability under RESTATEMENT (SECOND) OF TORTS, § 402A, asserting that the Werner SRS-72 scaffold was defective because of a design defect and failure-to-warn.[2]

---

[2] RESTATEMENT (SECOND) OF TORTS, § 402A (1965), provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
>     (a) the seller is engaged in the business of selling such a product, and
>
>     (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
>     (a) the seller has exercised all possible care in the preparation and sale of his product, and
>
>     (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

We have explained the different doctrines under which a plaintiff can prove a product's defectiveness:

> To prevail in an action under [S]ection 402A, the plaintiff must prove that the product was defective, the defect existed when it left the defendant's hands, and the defect caused the harm. The threshold inquiry in all products liability cases is whether there is a defect. This threshold
>
> > can be crossed ... either by proving a breakdown in the machine or a component thereof, traditionally known as a manufacturing defect; or in cases where there is no breakdown, by proving that the design of the machine

For the design defect, Sullivan alleged that it was foreseeable that the platform could collapse during normal use of the scaffold. Under his theory, a user would inadvertently rotate the deck pins off the platform by kicking them while working or when the user moved tools or materials near the pins. With the deck pins rotated off, the platform would become unseated when the user climbed the rungs or moved the scaffold. The platform would stay unseated because of a weld protrusion in one of the platform's steel corners. The user would then be unaware that the platform was misaligned, leading to a collapse once the user stepped back on the unsecured platform.

As for failure-to-warn, the side rails contained a sticker instructing the user to "[e]nsure deck pin is completely rotated and platform is seated within side rails before each use." Besides being obscured by the deck pins and not warning of the consequences for failing to follow, the instruction was alleged

---

> results in an unreasonably dangerous product, traditionally known as a design defect.
>
> A third doctrine recognized under [S]ection 402A is the "failure-to-warn" theory, under which the plaintiff may recover for the defendant's failure to provide adequate instructions to the user on how to use the product as the product was designed. To succeed on a claim of inadequate or lack of warning, a plaintiff must prove that the lack of warning rendered the product unreasonably dangerous and that it was the proximate cause of the injury.

*Barton v. Lowe's Home Centers, Inc.*, 124 A.3d 349, 354-55 (Pa. Super. 2015) (internal citations and some quotation marks omitted).

defective because it did not clarify that "each use" included checking the pins and platform each time the user climbed off the platform.

To support his claims, Sullivan obtained the opinion of Russell Rasnic (Rasnic), an expert in mechanical engineering. In his report, Rasnic stated that the Werner SRS-72 scaffold was defective because the deck pins could become inadvertently rotated off the platform, which could then lead to the platform becoming unseated from the side rails. In finding the scaffold defective, Rasnic reviewed several similar scaffolds and concluded that there are safer alternative designs to protect against a platform collapsing during normal use. In particular, other manufacturers included four deck pins instead of two to secure the platform. Additionally, other manufacturers included positive alignment devices to their deck pins to ensure that they could not be rotated off the platform. Having found the scaffold defective, Rasnic further concluded that the scaffold's defectiveness caused the accident.

As part of his analysis, Rasnic filmed himself testing an exemplar Werner SRS-72 scaffold. The videotaped testing shows Rasnic making the platform collapse twice. He does this by first setting the welded corner of the platform on top of the side rail. With the deck pins still on, Rasnic gets on the platform while hanging onto the ceiling. After kicking out a deck pin, he steps on the platform and causes it to immediately collapse. He does this a second time but has to apply lateral force several times before the platform collapses.

Manufacturer countered with its own engineering expert, Erick H. Knox, Ph.D. (Knox). He disagreed that it was foreseeable a user would unknowingly rotate the deck pins off the platform while using the scaffold. Further, he rebutted Rasnic's claims about safer alternative designs by observing that the inverted L-shaped design of the deck pins was the most prevalent in the industry. He also noted that the Werner SRS-72 scaffold complied with the safety standards of the American National Standards Institute (ANSI) and Occupational Safety and Health Administration (OSHA). In his view, the alternative designs detailed by Rasnic were unnecessary to ensure a user's safety.

Additionally, Knox concluded that a properly seated platform will remain so during normal use with the deck pins engaged. Through his own testing, he determined that a properly seated platform will not become misaligned even with abnormal pressure being applied to the scaffold. He concluded that the only way the platform could collapse in the way that Sullivan described was if he did not properly place it within the side rails with the deck pins engaged before climbing on it. Knox added that Sullivan could have avoided the accident by following the instruction that the platform be seated within the side rails with the deck pins rotated "before each use."

Before trial, Sullivan filed a motion *in limine* to bar the admission of any government or industry standards evidence at trial, arguing that Pennsylvania courts have generally barred such evidence in strict liability cases.

Importantly, he contended, this prohibition was unaffected by the Pennsylvania Supreme Court's decision in ***Tincher v. Omega Flex, Inc.***, 104 A.3d 328 (Pa. 2014), which, as discussed below, erased the strict distinction between negligence and strict liability. Manufacturer took the opposite view, arguing that, after ***Tincher***, government and industry standards evidence was admissible in strict liability cases. The trial court, however, agreed with Sullivan and granted the motion. Because of the ruling, Manufacturer was precluded from introducing scaffolds from other manufacturers that had deck pins similar to those used in the Werner SRS-72 scaffold.

Manufacturer, meanwhile, filed two pretrial motions *in limine* seeking to limit Rasnic's testimony at trial. In the first, Manufacturer argued that no evidence supported Rasnic's opinion about how the platform collapsed. Under this argument, his opinion about how the accident happened was speculative because neither Sullivan nor Bentzley remembered the deck pins being disengaged or the platform being unseated. Similarly, in their other motion, Manufacturer sought to preclude Rasnic's videotaped testing. According to Manufacturer, the conditions of the testing differed from those described by Sullivan, emphasizing that Rasnic intentionally displaced the platform and applied "abnormal, unforeseeable" force to get the platform to collapse.

The trial court denied both motions. As a result, the trial court allowed Rasnic to opine that the scaffold was defective without testimony that the deck

pins became disengaged or the platform became unseated. Likewise, Sullivan could show the jury Rasnic's videotaped testing during his testimony.

The parties proceeded to a two-week jury trial. During trial, a dispute arose whether Manufacturer could argue that Sullivan's negligence caused the accident. Manufacturer insisted it be allowed to argue that Sullivan was the sole cause of the accident, asserting that he was negligent for failing to ensure that the platform was seated with the deck pins fully rotated each time he climbed onto the platform. Sullivan responded that contributory negligence is inadmissible in strict liability actions unless it amounts to assumption of risk, misuse of a product or highly reckless conduct.

Agreeing with Sullivan, the trial court ruled that Manufacturer could not argue in its closing statement that Sullivan's negligence was the sole cause of the accident.

> And then finally, again, having reviewed all the case law the defendant can argue, during closing, when it comes to causation, that the platform didn't collapse and they can argue, during the design defect part of it, that people, the average consumer or whatever, who heeds the warnings won't fall. But I did not find that the plaintiff's conduct could be found as extreme recklessness or whatever it's called. In fact, the case law makes it pretty clear that it has to be that even if the thing was designed properly, the recklessness still would have been so severe that he would have gotten injured anyway.
>
> So, because it doesn't rise to that level, it can't be used in causation and it can't be talked about specifically during the design defect portion except, again, to reference that the warning is sound and someone, when you're looking at whether this is a properly designed product, you can consider this warning and how the typical consumer, reasonable consumer, would react to it.

N.T., 5/6/19, at 88.

Consistent with its holding, the trial court instructed the jury during its final charge that it could not consider any negligence or lack of due care by Sullivan as part of its defectiveness determination. Rather, the jury would need to consider the risk-utility factors and determine "what product a reasonable manufacturer would design." N.T., 5/9/19, at 114. The trial court gave a similar instruction about causation, warning the jury that it "may not consider any negligence – negligence that is lack of due care – with respect to [Sullivan's] handling of the scaffold's warnings or the assembly of the scaffold." *Id*. at 116.

The jury returned a verdict in favor of Sullivan, finding that his injuries were caused by a design defect in the scaffold.[3] Having so found, the jury awarded Sullivan $2.5 million in monetary damages. After denying Manufacturer's motion for post-trial relief under Pa.R.C.P. 227.1, the trial court granted delay damages of $248,625, bringing the total verdict to $2,748,625.

Manufacturer timely appealed and now raises three issues for review.

> 1. Did the trial court abuse its discretion in precluding [Manufacturer] from introducing evidence of compliance with industry safety standard, including evidence of other scaffolds with the same relevant design characteristics as [Manufacturer's]

---

[3] The jury determined the scaffold's warnings were defective but not a factual cause of Sullivan's injuries.

product, especially after [the Sullivans] were permitted to introduce evidence of other scaffolds with dissimilar designs?

2. Did the trial court commit an error of law in instructing the jury that it could not consider any negligence of [Sullivan] and in precluding [Manufacturer] from arguing that [Sullivan's] conduct was the sole proximate cause of his injuries?

3. Did the trial court abuse its discretion in denying [Manufacturer's] motion *in limine* to preclude [Sullivan's] expert witness opinion testimony and demonstrative evidence videotape, where the expert's opinions, and the demonstrative evidence videotape, were not based on any facts of record?

Manufacturer' Brief at 7-8.

## II.

Manufacturer first contends that the trial court erred in precluding evidence that the scaffold complied with government and industry standards.[4] Manufacturer asserts that it should have been permitted to introduce evidence of other scaffolds with deck pins similar in design to those used in its scaffold. While the parties generally agree that this evidence was inadmissible under long-standing Pennsylvania case law, they differ over what effect the Pennsylvania Supreme Court's decision in ***Tincher*** had on the evidentiary prohibition against government and industry standards evidence in strict liability cases.

---

[4] "Questions concerning the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion." ***Waldron Elec. Heating and Cooling, Inc. v. Caseber***, 174 A.3d 1123, 1125 (Pa. Super. 2017) (citation omitted).

Manufacturer argues that *Tincher* substantially changed strict liability law, including the prohibition against industry standards evidence. To support this claim, Manufacturer cites several federal district court cases for the proposition that, post-*Tincher*, government and industry standards is admissible in strict liability cases. These cases, Manufacturer contends, recognize that *Tincher* lifted the long-time ban of negligence concepts in strict liability, like a manufacturer's compliance with industry standards in designing a product. Sullivan counters that *Tincher* did not affect the evidentiary prohibition, pointing to this Court's post-*Tincher* decision in ***Webb v. Volvo Cars of North America, LLC***, 148 A.3d 473 (Pa. Super. 2016). According to him, this Court in ***Webb*** effectively reestablished the evidentiary prohibition of industry standards evidence in strict liability actions.

**A.**

To address this issue, a survey of the case law on the admissibility of government and industry standards evidence in strict liability actions is needed. Before *Tincher*, our courts prohibited industry standards evidence in strict liability actions. This prohibition began, in part, with our Supreme Court's decision in ***Azzarello v. Black Bros., Co.***, 391 A.2d 1020 (Pa. 1978) where our:[5]

---

[5] ***Azzarello*** held that it was improper to introduce negligence concepts into a strict liability case; it was for the court, not a jury, to determine whether a product was "unreasonably dangerous" under the Second Restatement; the

- 13 -

> Supreme Court created a distinct divide between strict liability and negligence claims, by suggesting that negligence concepts have no place in Pennsylvania strict liability doctrine. Specifically, the **Azzarello** Court had deemed the phrase "unreasonably dangerous" to be negligence rhetoric that would mislead jurors in a strict liability case. Although the Supreme Court reasoned that a jury was permitted to determine whether the product was defective or to resolve any "dispute as to the condition of a product," the Supreme Court established that the threshold question of whether a product was unreasonably dangerous was to be determined by the trial court. **Id**. [at 1025].

**High v. Pennsy Supply, Inc.**, 154 A.3d 341, 347 (Pa. Super. 2017).

After **Azzarello**, our Supreme Court confronted the issue of industry standards evidence in **Lewis v. Coffing Hoist Division, Duff-Norton Company, Inc.**, 528 A.2d 590 (Pa. 1987), holding that a trial court did not err in precluding evidence that the alleged defective product - a control box for an electric chain-hoist - was widespread in its industry. The **Lewis** Court framed its holding around the relevancy of industry standards evidence when determining whether a product is defective. **Id**. at 592. Reviewing the approaches of multiple jurisdictions, the Court emphasized that most courts have held that "it is the product itself which is on trial, and not the manufacturer's conduct." **Id**. at 593. This being the case, the Court observed

---

dispositive question in a case alleging that there was a defective design was whether the product is safe for its intended use; and in such a case, "the seller is the 'guarantor' of the product, and a jury could find a defect 'where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for its intended use.' " **Tincher**, 104 A.3d at 367 (quoting **Azzarello**, 391 A.2d at 1025-27).

that industry standards evidence "improperly focuses on the quality of the defendant's conduct in making its design choice, and not on the attributes of the product itself." *Id.* at 594 (citing *Lenhardt v. Ford Motor Co.*, 102 Wash.2d 208, 683 P.2d 1097 (1984)). Furthermore, the Court added, "if a manufacturer's product has design attributes which make it unsafe for its intended use, there is no relevance in the fact that such a design is widespread in the industry." *Id.*

Citing *Azzarello* as support for its holding, the Court stated the following:

> Besides holding that a product is defective when it leaves the supplier's control lacking any element necessary to make it safe for its intended use, [the *Azzarello* Court] also concluded, if not expressly, then certainly by clear implication, that negligence concepts have no place in a case based on strict liability.

*Id*. at 593. Because industry standards evidence went to the reasonableness of a manufacturer's conduct in designing the product, *Lewis* reasoned that industry standards evidence improperly introduced concepts of negligence into strict liability. *Id*. at 594. This evidence, the Court noted, would likely divert a jury's attention from the product itself to the manufacturer's conduct in designing the product. *Id*.

We followed the *Lewis* evidentiary prohibition in *Gaudio v. Ford Motor Co.*, 976 A.2d 524 (Pa. Super. 2009). In *Gaudio*, we held that a trial court correctly applied *Lewis* in precluding evidence of a manufacturer's compliance with industry standards relating to seat belts. *Id*. at 543. As part of our

holding, we observed that we had extended the **Lewis** Court's rationale for excluding industry standards evidence to also prohibit the admission of governmental standards evidence. **Id**. at 543-44 (citing **Sheehan v. Cincinnati Shaper Co.**, 555 A.2d 135, 1355 (Pa. Super. 1989) (excluding OSHA standards) and **Majdic v. Cincinnati Machine Co.**, 537 A.2d 334 (Pa. Super. 1988) (excluding ANSI standards)).

Together, **Lewis** and **Gaudio** established a clear prohibition against industry and government standards in strict product's liability. The question here is what impact **Tincher** had when it expressly overruled **Azzarello** and the strict division of negligence and strict liability. Now to **Tincher**.

## B.

In **Tincher**, our Supreme Court sought to address criticism from both within the Court[6] and from outside commentators of **Azzarello's** idiosyncratic, "super" strict liability approach[7] to products liability claims, as well as to address agitation to adopt RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. §§ 1-4. We have described the facts and issues of **Tincher**.

> In **Tincher**, the plaintiffs sued the defendant manufacturer in negligence and strict liability alleging, among other things,

---

[6] "[W]e again recognize the continuing state of disrepair in the arena of Pennsylvania strict-liability design defect law." **Beard v. Johnson & Johnson. Inc.**, 41 A.3d 823, 836 (Pa. 2012).

[7] In **Lewis**, the Court emphasized that in **Azzarello**, it had taken "another approach," different from either the "consumer expectations" or risk-utility theories adopted in other states. **Lewis**, 528 A.2d at 593.

defectively designed corrugated steel tubing. *Tincher*, 104 A.3d at 335–36. The plaintiffs alleged the steel tubing, which delivered natural gas to a gas fireplace in their home, melted after a lightning strike and ignited the natural gas inside. *Id.* The resulting fire caused significant damage to the plaintiff's home and personal property. *Id.* Prior to trial, the defendant filed a motion *in limine* asking the trial court to apply Sections 1 and 2 of the Restatement (Third) of Torts to plaintiffs' strict liability claim. *Id.* at 336. The defendant argued, in accord with the Third Restatement, that plaintiff had the burden to prove an alternate, safer design. *Id.* at 341. The defendant argued that the Third Restatement makes foreseeability of harm relevant to a strict products liability claim. *Id.* at 342–43. In other words, the defendant believed the reasonableness of its conduct must inform the analysis of the strict products liability claim against it. *Id.* at 344.

*Webb*, 148 A.3d at 481-82.

As part of its analysis, *Tincher* reviewed its post-*Azzarello* case law and criticism of the strict separation between negligence and strict liability concepts in design defect cases. The Court underscored that Section 402A relieves plaintiffs of the burden of proving the absence of due care in the manufacturing process. *Tincher*, 104 A.3d at 371. This did not, however, necessarily apply in design defect cases in which "the character of the product and the conduct of the manufacturer are largely inseparable." *Id.* (quoting *Phillips v. Crickett Lighters*, 841 A.2d 1000, 1015 (Pa. 2003) (Saylor, J. concurring)). Finding that the separation between negligence and strict products liability neither reflected the realities of practice nor served the interests of justice, the *Tincher* Court overruled *Azzarello* to the extent that it was "in tension with the principles articulated in this Opinion." *Id*. at 376.

While it recognized that negligence principles are part of products liability law, *Tincher* made clear that it did not mean that those tort principles were paramount. In examining the historical development of products liability law, *Tincher* emphasized significant ways in which products liability law in tort differed from other negligence-based causes of action. *Tincher*, 104 A.3d at 357. It went on to note that products liability law was also underpinned by contract warranty law, which never had anything to do with negligence principles. *Id.* at 357 ("Redress for injury caused by products was available in tort ... or by asserting breach of warranty claims.").

Despite overruling *Azzarello*, the *Tincher* Court declined to adopt the Third Restatement, holding instead that a plaintiff may prove a product is defective by showing that either: (1) "the danger is unknowable and unacceptable to the average or ordinary consumer" ("consumer expectations standard"); or (2) "a 'reasonable person' would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions" ("risk-utility standard"). *Id.* at 385–91 (citations omitted).[8]

_____

[8] We note that RESTATEMENT (THIRD) OF TORTS: PRODS. LIAB. § 4 deals with evidentiary value of governmental and administrative standards and provides that:

> In connection with liability for defective design or inadequate instructions or warnings:

Under the risk-utility standard, which is the theory that Sullivan proceeded under at trial, there are seven factors for the factfinder to balance when determining whether a product is defective.

(1) the usefulness and desirability of the product – its utility to the user and the public as a whole;

(2) the safety aspects of the product – the likelihood that it will cause injury, and the probable seriousness of the injury;

(3) the availability of a substitute product which would meet the same need and not be as unsafe;

(4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility;

(5) the user's ability to avoid danger by the exercise of care in the use of the product;

(6) the user's anticipated awareness of the dangers inherent in the product and their availability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions; and

(7) the feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.

---

(a) a product's noncompliance with an applicable product safety statute or administrative regulation renders the product defective with respect to the risks sought to be reduced by the statute or regulation; and

(b) a product's compliance with an applicable product safety statute or administrative regulation is properly considered in determining whether the product is defective with respect to the risks sought to be reduced by the statute or regulation, but such compliance does not preclude as a matter of law a finding of product defect.

*Id.* at 398-99 (quoting John W. Wade, *On the Nature of Strict Tort Liability for Products*, 44 Miss. L. J. 825, 837-38 (1973)). *Tincher* also returned the question of whether a product is "unreasonably dangerous" decided by the trial court under *Azzarello* back to the jury to be determined under the tests set forth above.

Relevant to this appeal, while *Tincher* discussed *Lewis*, it did not overrule it, nor any other cases besides *Azzarello*. Anticipating the impact that its decision to overrule *Azzarello* would have, the Supreme Court in *Tincher* gave a disclaimer about the effect of its decision on related legal issues in strict liability.

> We recognize—and the bench and bar should recognize—that the decision to overrule *Azzarello* and articulate a standard of proof premised upon alternative tests in relation to claims of a product defective in design may have an impact upon other foundational issues regarding manufacturing or warning claims, and upon subsidiary issues constructed from *Azzarello*, such as the availability of negligence-derived defenses, bystander compensation, or the proper application of the intended use doctrine. *Accord Bugosh [v. I.U. North America, Inc.*, 971 A.2d 1228, 1244–45 & 1248–49 (3d Cir. 2009)]. These considerations and effects are outside the scope of the facts of this dispute and, understandably, have not been briefed by the [the parties].
>
> This Opinion does not purport to either approve or disapprove prior decisional law, or available alternatives suggested by commentators or the Restatements, relating to foundational or subsidiary considerations and consequences of our explicit holdings. In light of our prior discussion, the difficulties that justify our restraint should be readily apparent.

*Tincher*, 104 A.3d at 409-10.

## C.

In **Webb**, we considered **Tincher's** impact on the formerly well-established **Lewis/Gaudio** prohibition against government or industry standards evidence in strict liability cases. There, the trial court instructed a jury that it was allowed to consider federal motor vehicle safety standards in a strict products liability action even though the court had dismissed the plaintiff's negligence claims. After the jury returned a verdict for the manufacturer on strict liability, plaintiff appealed to argue that the trial court's jury instruction improperly injected negligence concepts into its strict liability claim. **Webb**, 148 A.3d at 477-78.

To address plaintiff's issue, **Webb** summarized the state of the law on the issue after **Tincher**.

> To summarize, **Azzarello**, with its strict prohibition on introducing negligence concepts into strict products liability claims, is no longer the law in Pennsylvania. The rule presently at issue—the prohibition of government or industry standards evidence in a strict products liability case—clearly has its genesis in the now-defunct **Azzarello** regime. The **Lewis** and **Gaudio** Courts both relied primarily on **Azzarello** to support the preclusion of government or industry standards evidence, because it introduces negligence concepts into a strict liability claim.

**Id**. at 482-83.

Plaintiff argued that the **Lewis**/**Gaudio** evidentiary prohibition remained good law because **Tincher** did not expressly overrule either case. We essentially agreed, although with some qualification.

> We conclude that the overruling of **Azzarello** does not provide this panel with a sufficient basis for disregarding the evidentiary

- 21 -

rule expressed in *Lewis* and *Gaudio*. While it is clear after *Tincher* that the firm division between strict liability and negligence concepts no longer exists, it is not clear that the prohibition on evidence of government or industry standards no longer applies. *Lewis*, in particular, noted that a defective design could be widespread in an industry. *Lewis*, 528 A.2d at 594. The *Tincher* opinion does not undermine that rationale for excluding governmental or industry standards evidence. Furthermore, *Tincher* expressed two theories of strict products liability— consumer expectations and risk-utility. It is possible that government/industry standards evidence could be admissible under both theories, one and not the other, or neither. It is also possible that the admissibility of such evidence will depend upon the circumstances of a case. The *Tincher* Court noted the possibility of shifting the burden of production and persuasion to the defendant under the risk-utility theory. This burden shift, if it becomes law, may provide defendants a basis to advocate for the admissibility of government or industry standards evidence in risk-utility cases.

These contingencies illustrate that *Tincher* will affect every stage of future products liability cases. Post-*Tincher*, parties must tailor their pleadings, discovery, and trial strategy to one or both of the new theories of liability. We believe the continued vitality of the prohibition on government and industry standards evidence is a question best addressed in a post-*Tincher* case.

*Webb*, 148 A.3d at 483.

We concluded that the trial court should have instructed the jury to disregard the federal standards evidence once it dismissed the negligence claims that were the basis for the evidence's relevance in the first place. *Id*. at 484.

In the years after *Webb*, this Court has had little opportunity to readdress whether the *Lewis/Gaudio* evidentiary prohibition remained good law. We briefly discussed the issue in *Renninger v. A & R Machine Shop*, 163 A.3d 988 (Pa. Super. 2017), a case that involved a challenge to the

admission of federal standards evidence in a strict liability case.  Without deciding whether the trial court committed error, we held that the admission was harmless based on the jury's verdict, noting that neither party on appeal offered substantive argument for the admission or exclusion of industry or governmental standards evidence post-***Tincher***.  ***Id***. at 1000.

Most recently, in ***Dunlap v. Federal Signal Corp.***, 194 A.3d 1067 (Pa. Super. 2018), we discussed the evidentiary prohibition in the context of a strict liability action brought by a group of firefighters alleging that they suffered hearing loss from their firetrucks' sirens.  Proceeding under the risk-utility standard for its design defect claim, the plaintiffs retained an expert who believed there was a safer alternative design for the sirens that could meet industry standards yet avoid causing hearing damage. ***Id***. at 1068.  The trial court, however, dismissed the claim on summary judgment by finding that the industry standards evidence was not enough to establish that the expert's proposed alternative design met the third factor for risk-utility:  the availability of a substitute product which would meet the same need and not be as unsafe.  The plaintiffs' industry standards evidence, therefore, was not enough to prove that an alternative design would provide as much protection to motorists and pedestrians as the manufacturer's siren.  ***Id***. at 1068-69.

On appeal, we affirmed.  In finding that the putative industry standards evidence was insufficient, we observed that the ***Webb*** panel concluded that ***Tincher***, despite overruling ***Azzarello***, did not provide a sufficient basis for

- 23 -

disregarding the ***Lewis***/***Gaudio*** evidentiary rule "that a product's compliance with government standards is irrelevant and inadmissible in a strict products liability action." ***Id***. at 1072. In particular, we noted, the ***Webb*** panel concluded that ***Tincher*** did not undermine the ***Lewis*** rationale for the industry standards prohibition, specifically, that a product could be defective yet still widespread in an industry. ***Id***. at 1073. As a result, ***Dunlap*** agreed with the trial court that the plaintiff firefighters needed more evidence on the effectiveness of the alternative design beyond that it met industry standards. ***Id***. We note, though, that the issue in ***Dunlap*** was not whether industry standards evidence is admissible, but whether the plaintiffs had made out a *prima facie* case that a safer alternate design was available to the manufacturer.

## D.

Manufacturer contends that ***Tincher*** allows the introduction of government and industry standards, building its argument not on Pennsylvania case law but around several federal district court decisions. Under this view, these cases show that, post-***Tincher***, manufacturers can admit relevant government and industry standard evidence in strict liability cases. Manufacturer's Brief at 33. At the outset, though, we note that federal district court decisions, as well as those by federal Courts of Appeal, are not binding on Pennsylvania courts. ***Dietz v. Chase Home Finance, LLC***, 41 A.3d 882, 886 n.3 (Pa. Super. 2012).

Among Manufacturer's cited cases, the most persuasive is **Cloud v. Electrolux Home Products, Inc.**, 2017 WL 3835602 (E.D. Pa. 2017). There, a district court had to determine whether a manufacturer could introduce evidence of compliance with ANSI standards to defend against a strict products liability claim. **Id**. at *1. Holding the evidence would be relevant, the court emphasized that under **Tincher**, the risk-utility standard gives "courts an opportunity to analyze post hoc whether a manufacturer's conduct in manufacturing or designing a product was reasonable, which clearly reflects the negligence roots of strict liability." **Id**. at *2 (quoting **Tincher**, 104 A.3d at 389). It then went on to state that the distinction between negligence and strict products liability espoused in **Lewis** was "in tension" with the holding in **Tincher** that a manufacturer's conduct and reasonableness is relevant to whether a product is defective. **Id**. The district court found that the proposed evidence, while not dispositive, was relevant and probative to the plaintiffs' strict products liability case. **Id**.[9]

_____

[9] We are less persuaded by the other two cases that Manufacturer cites. In **Vitale v. Electrolux Home Products, Inc.**, 2018 WL 3868671 (E.D. Pa. 2018), the district court denied a pretrial motion to exclude industry standards evidence, in part, because the plaintiffs asserted both negligence and strict liability claims. **Id**. at *3. In the other case, **Rapchak v. Haldex Brake Products Corp.**, 2016 WL 3752908 (W.D. Pa. 2016), the district court held that it was premature to rule on whether industry standards evidence could be admissible because plaintiff had not yet identified what evidence she believed defendant manufacturer intended to introduce. **Id**. at *3.

However, not all district courts that have looked at this issue have reached the same conclusion. In ***Mercuio v. Louisville Ladder, Inc.***, 2019 WL 1657325 (M.D. Pa. 2019), that district court considered a plaintiff's pretrial motion to preclude evidence of the manufacturer's compliance with industry standards in its design of a ladder. ***Id***. at *2. After an exhaustive review of Pennsylvania case law on the issue, including **Webb** and **Dunlap**, the district court concluded that "no lower Pennsylvania Court has provided a definitive ruling on the ongoing vitality of the evidentiary rule now before the Court." ***Id***. at *7. On one hand, that court observed, "to adhere to the strict prohibition of such evidence based on the **Lewis**/**Gaudio** rule does not comport with the *dicta* contained in **Tincher** and **Webb** or the Superior Court's tacit acknowledgment in **Renninger** and **Dunlap** that the issue remained unresolved." Even so, the district court still ruled that unless the plaintiff opens the door, evidence of compliance with government or industry standards would be inadmissible at trial, adding that its ruling was consistent "with the agreement of both the majority and dissent in **Dunlap** that **Webb** recognized that **Tincher** did not abrogate the accepted notion that defective design can be widespread in an industry, and that compliance with industry standards is not proof of non-defectiveness[.]" ***Id***. (citation omitted).

**E.**

Having reviewed the relevant Pennsylvania case law, we make a few observations. First, notwithstanding suggested interpretations of ***Tincher***

that would make products liability law negligence-based on the due care of the manufacturer in designing or manufacturing the product, strict liability is still the standard to be used in determining whether a product is "unreasonably dangerous" in Pennsylvania. Under the RESTATEMENT (SECOND) § 402A formulation, a product can be designed and manufactured with "all possible care" but still be defective. Manufacturer liability then depends on the product's dangers, not on the reasonableness of the manufacturer's conduct in designing or manufacturing the product.

Under the Section 402A standard, knowledge of the product's danger is imputed to the manufacturer in the design and manufacturing of the product no matter how foreseeable the defect was or how reasonable its conduct in the design and manufacture. If imputation of knowledge of the danger to the manufacturer is eliminated by the standard as to whether the manufacturer could have reasonably foreseen the risks of the product, that has the same effect as eliminating liability without negligence on the part of the manufacturer. In other words, strict liability would be eliminated, something that *Tincher* did not do.

Reasonableness or foreseeability may be taken into consideration in other aspects of liability such as "negligence-derived defenses, bystander compensation, or the proper application of the intended use doctrine." *Tincher* at 409. Generally, those concepts may be used in determining whether, in light of its inherent dangers, the product fails to satisfy either

discernable consumer expectations of safety or a risk/utility analysis. Negligence principles are not used in determining whether the manufacturer exercised due car in the design and manufacture of the product.

Second, the Supreme Court's decision in *Tincher* to overrule *Azzarello* did cast some doubt on the *Lewis/Gaudio* evidentiary prohibition against government and industry standards evidence in strict liability actions. However, *Tincher* does not cast any more doubt on that principle than any other decision issued while *Azzarello* was extant. *Tincher* foresaw that its holding could impact subsidiary issues derived from *Azzarrello*. It advised, "[t]he common law regarding these related considerations should develop within the proper factual contexts against the background of targeted advocacy." *Tincher*, 104 A.3d at 409. Following *Tincher*, however, no Pennsylvania court has held that *Tincher*, in overruling the *Azzarello* paradigm, has implicitly overruled *Lewis*/*Gaudio* just because our Supreme Court disavowed the strict separation of negligence concepts from strict products liability law.

A final and important observation. In *Tincher,* after overruling *Azzarello,* our Supreme Court remanded the case to the trial court with instructions to reconsider the post-trial motions pursuant to Section 402A of the RESTATEMENT (SECOND) OF TORTS. *Tincher* at 136. In other words, in addressing issues involving products liability, our touchstone is Section 402A. RESTATEMENT (SECOND) OF TORTS § 402A(2)(a) provides that strict liability is

established, notwithstanding that the "the seller has exercised all possible care in the preparation and sale of his product." Whether a manufacturer has complied with industry or government standards goes to whether it "exercised all possible care in preparation of product" in making the design choice, not on whether there was a design defect in the product itself.

Under the above-quoted provision of the RESTATEMENT (SECOND), it is irrelevant if a product is designed with all possible care, including whether it has complied with all industry and governmental standards, because the manufacturer is still liable if the product is unsafe. This highlights:

> The fundamental problem with a state of the art [industry standard] defense is that it is all about the character of the manufacturer/distributor's conduct, not the product's safety. In essence, it boils down to an assertion by the defendant roughly to this effect: "Sure, the product may be dangerous, but we did everything we reasonably could to make it safe, everything that was done by other manufacturers/distributors in our industry. Our product was as good as it could be given the state of the art at the time." This is a due care defense, pure and simple, and it sounds in negligence. It deflects attention away from the condition of the product toward the conduct of the defendant. Like many due care arguments, it relies on compliance with industry standards or custom (that is, the "state of the art") as a means of showing due care. It is entirely inconsistent with Section 402A's principle that a product can be defective, even if a manufacturer/distributor exercised "all possible care" in its creation and sale. A defendant who asserts compliance with the "state of the art" is simply maintaining that the defendant has exercised reasonable (or perhaps, though not necessarily, all possible) care with respect to the product's design, but under the governing principles of Section 402A that clearly should not be an available defense.

Ellen Wertheimer & Mark C. Rahdert, *The Force Awakens: Tincher, Section 402a, and the Third Restatement in Pennsylvania*, 27 Widener Commonwealth

L. Rev. 157, 210 (2018). Under such reasoning, evidence of industry standards may be excluded because those standards do not go to the safety of the product itself but to the manufacturers' "possible care in preparation of product," which is irrelevant to whether a product is unsafe or strict liability is established.

**F.**

Returning to this appeal, it is important to remember that what is involved is not a negligence concept but whether the trial court erred in excluding evidence - a function that is well within its sound discretion and one which we will not question unless it was manifestly unreasonable. While we agree with **Webb** that our Supreme Court may allow industry and governmental standards in a manner suggested by the RESTATEMENT (THIRD) in the future, until it does, **Tincher** neither explicitly nor implicitly overrules the exclusion of industry standards in a products liability case. Moreover, as explained above, the language of RESTATEMENT (SECOND) OF TORTS § 402A(2)(a) provides sufficient reason to exclude such evidence. Accordingly, the trial court's decision to exclude such evidence was not unreasonable.[10]

_____

[10] Appellants also argue that Sullivan "opened the door" to industry standards evidence because he elicited testimony about other scaffolds' deck pins. Appellants' Brief at 42. Appellants' argument, however, consists of two paragraphs with no analysis of the trial record or supporting case law. *See* Pa.R.A.P. 2119(a) (stating that the argument must include "such discussion and citation of authorities as are deemed pertinent."); **Commonwealth v. McMullen**, 745 A.2d 683, 689 (Pa. Super. 2000) (stating that "[w]hen the

## III.

Manufacturer next contends that the trial court erred in instructing the jury that it could not consider whether Sullivan was negligent in determining defectiveness or causation. By so instructing, Manufacturer asserts, the trial court prevented it from arguing that Sullivan was the sole cause of the accident. Manufacturer insists that the trial court should have allowed them to argue that Sullivan was negligent for failing to properly seat the platform within the side rails and engage the deck pins, as this is the only explanation for how the accident could have happened.[11]

---

appellant fails to adequately develop his argument, meaningful appellate review is not possible." (citation omitted)). Without a developed argument on this issue, we need not address whether a defendant manufacturer can introduce evidence of compliance with industry standards to rebut a plaintiff's design defect claim under the risk-utility standard.

[11] Our standard of review for a challenge to jury instructions is well-established:

> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.

> The proper test is not whether certain portions or isolated excerpts taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not

This issue centers on to what extent a plaintiff's ordinary negligence can be asserted as a defense in a strict product's liability action. Generally, a defendant cannot use contributory negligence concepts to excuse a product's defect or reduce recovery by comparing fault in a strict product's liability action. *Kimco Development Corp. v. Michael D's Carpet Outlets*, 637 A.2d 603, 606-07 (Pa. 1993). On the other hand, however, a plaintiff's conduct is not always irrelevant in strict liability. *Childers v. Power Line Equipment Rentals*, 681 A.2d 201, 207 (Pa. Super. 1996). Indeed, "[i]nquiry into the plaintiff's use of the product may be relevant as it relates to causation." *Madonna v. Harley Davidson, Inc.*, 708 A.2d 507, 508 (Pa. Super. 1998) (citation omitted).

Accordingly, there are limited exceptions to when the plaintiff's conduct may be relevant, including "evidence of a plaintiff's voluntary assumption of the risk, misuse of a product, or highly reckless conduct is admissible insofar as it relates to the element of causation." *Clark v. Bil-Jax, Inc.*, 763 A.2d

---

error was committed and whether that error was prejudicial to the complaining party.

In other words, there is no right to have any particular form of instruction given; it is enough that the charge clearly and accurately explains the relevant law.

*Krepps v. Snyder*, 112 A.3d 1246, 1256 (Pa. Super. 2015) (internal citations and quotation marks omitted).

920, 923 (Pa. Super. 2000) (quoting **Charlton v. Toyota Industrial Equipment**, 714 A.2d 1043, 1047 (Pa. Super. 1998)).

Unlike these exceptions, "evidence of a plaintiff's ordinary negligence may not be admitted in a strict products liability action ... unless it is shown that the accident was solely the result of the user's conduct and not related in any [way] with the alleged defect in the product." **Id**. Put differently, "a user's negligence is not relevant if the product defect contributed in any way to the harm." **Madonna**, 708 A.2d at 509.

In their brief, Manufacturer reviews much of this same precedent in arriving at the conclusion that Pennsylvania's strict products liability law, even before **Tincher**, allowed a manufacturer to argue that a plaintiff's negligence was the sole proximate cause of his injuries.[12] Manufacturer contends that it should have been allowed to argue that Sullivan was solely responsible for causing the accident by negligently failing to properly assemble the scaffold and seat the platform within the side rails with the deck pins engaged.[13]

_____

[12] Manufacturer also argues that the trial court should have allowed them to argue that Sullivan misused the product in failing to properly assemble it. Manufacturer's Brief at 54. No substantive argument, however, is provided beyond this bald contention.

[13] In their reply brief, Manufacturer asserts that the trial court erred in precluding their engineering expert from testifying that the cause of Sullivan's accident was his failure to assemble the product properly and seat the platform within the side rails correctly. Manufacturer's Reply Brief at 6, 11-12. Manufacturer, however, did not raise this claim in their initial brief. Our Rules of Appellate Procedure make clear that an "appellant may file a brief in

- 33 -

We agree with the Manufacturer to the extent that a defendant can admit evidence and argue that a plaintiff's ordinary negligence was the sole cause of an accident in a strict product's liability case. Manufacturer, however, ignores that this is allowed only when the accident was "not related in any with the alleged defect in the product." **Clark**, **supra**. Manufacturer, though, premises its theory of Sullivan's negligence on their contention that he failed "to properly assemble the product and/or seat the platform within the side rails, then engage the deck pins[.]" Manufacturer's Brief at 47. As a result, Manufacturer's claim fails by its own terms because the alleged negligence directly relates to the product itself and how Sullivan assembled it, including the alleged defective deck pins and platform. Put another way, Manufacturer's theory of negligence - that Sullivan did not properly assemble the scaffold - did not preclude the possibility that a product defect contributed to the accident.

To illustrate, in **Madonna**, the plaintiff crashed while riding a motorcycle and sued under a theory of strict product's liability, alleging that a bolt on the front wheel's brake was defective. **Madonna**, 708 A.2d at 508. At trial, defendant Harley Davidson offered evidence that plaintiff was intoxicated at

reply to matters raised by appellee's brief not previously raised in appellant's brief." Pa.R.A.P. 2113(a). Succinctly, an appellant cannot raise new issues in a reply brief. **Reginelli v. Boggs**, 181 A.3d 293, 307, n.15 (Pa. 2018) (citation omitted).

the time of the accident and that the bolt was working properly on the motorcycle. *Id*. On appeal, plaintiff argued that Harley Davidson had improperly injected negligence evidence into his strict liability action. We disagreed and found the admission proper because the evidence was admitted to show that the accident resulted solely from plaintiff's intoxication, which was unrelated in any way to the product. *Id*. at 509. We found no error and affirmed judgment. *Id*.

In contrast, in **Charlton**, the plaintiff was injured when a coworker backed over his foot with a forklift. Plaintiff sued the forklift's manufacturer and claimed that it was defective because its gas tank obstructed the driver's rear view, lacked rear view mirrors and had no alarm system for when the forklift was in reverse. **Charlton**, 714 A.2d at 1045. During trial, the court allowed the defendant manufacturer to admit evidence that plaintiff and the forklift's driver failed to pay attention to each other. *Id*. at 1047. We found that this was not enough to allow defendant to argue that plaintiff's negligence was the sole cause of his injuries. Significantly, we noted, defendant could not show that plaintiff's injures resulted solely from his and the driver's "careless conduct" rather than the alleged defects in the forklift. *Id*. at 1048.[14]

---

[14] In support of this argument, Manufacturer relies heavily on **Foley v. Clark Equipment Co.**, 523 A.2d 379 (Pa. Super. 1987). There, in facts much like **Charlton**, we held that evidence of the plaintiff and forklift driver's

As these cases show, a defendant cannot argue that a plaintiff's ordinary negligence was the sole cause of an accident unless it is unrelated to the product. Manufacturer's theory of Sullivan's negligence - that he did not set up the scaffold correctly - directly relates to the product. Despite this requirement being spelled out in our case law, Manufacturer does not address it in their argument, failing to explain how Sullivan's alleged failure to properly assemble the scaffold showed that none of the alleged product defects contributed in any way to the accident.

Accordingly, the trial court did not err in preventing Manufacturer from arguing that Sullivan's conduct was the sole cause of the accident. We also find the trial court did not abuse its discretion in instructing the jury it could not consider Sullivan's conduct, as it accurately explained the law based on its holding as to negligence.

**IV.**

Finally, Manufacturer raises two challenges to the trial testimony of Rasnic, who, as we explained earlier in our facts section, was Sullivan's

_____

inattentiveness was relevant to causation. ***Id***. at 394. In ***Charlton***, however, we found ***Foley*** to be of little precedential value and stated the following: "[t]o the extent ***Foley*** stands for the proposition that a plaintiff's ordinary negligence is admissible in a strict liability action," it contradicted our Supreme Court's subsequent decision in ***Kimco*** about negligence concepts being used in strict liability cases. ***Charlton***, 714 A.2d at 1048, n.6. We agree with this statement and note that the Third Circuit has as well. ***See Parks v. AlliedSignal, Inc.***, 113 F.3d 1327, 1335 (3d Cir. 1997) (stating ***Foley*** deviates from Pennsylvania strict products liability law).

- 36 -

mechanical engineering expert. First, Manufacturer contends that his opinion about the cause of the accident lacked an adequate factual foundation. Second, Manufacturer asserts that the trial court should have not allowed Sullivan to show the jury the videotape of Rasnic's testing of the scaffold.

**A.**

Before addressing whether Rasnic's opinion lacked a factual foundation, we address whether Manufacturer waived this claim as Sullivan contends in his brief. As noted earlier, Manufacturer filed a pretrial motion to bar Rasnic's expert opinion testimony. Manufacturer argued that Rasnic's opinion - that the platform collapsed after the deck pins must have become disengaged - was impermissibly speculative and lacking factual support. Manufacturer presented this argument on the first day of trial, but the trial court was unpersuaded and denied the motion.

> THE COURT: Well, there's the absence of any other -- and again, this all goes to weight, in the absence of other obvious reasons. And given the fact that even your witnesses concede it could happen, I think that's enough to allow it to go to the jury, but we'll see later on.
>
> [MANUFACTURER]: Okay.
>
> THE COURT: So, that motion is denied.

N.T., 4/29/19, at 16-17.

Manufacturer did not renew their objection later during trial when Rasnic testified. Consequently, Rasnic testified with no objection that the scaffold was defective and caused the accident based on Sullivan's testimony of what

happened. Manufacturer raised the issue in their motion for post-trial relief that the trial court denied. When Manufacturer raised it again in their court-ordered Pa.R.A.P. 1925(b) statement, the trial court found no waiver, instead finding that there was proper factual basis for Rasnic's opinions. As a result, the trial court held, "the jury was free to accept the facts as presented," as well as Rasnic's opinion that rested on them in finding that the defective scaffold caused the accident. T.C.O. at 8 (unpaginated).

Pennsylvania Rule of Evidence 103 addresses waiver of issues raised in pretrial motions.

> **Rule 103. Rulings on Evidence**
>
> **(a)** Preserving **a Claim of Error**. A party may claim error in a ruling to admit or exclude evidence only:
>
> (1) if the ruling admits evidence, a party, on the record:
>
> (A) makes a timely objection, motion to strike, or motion *in limine;* and
>
> (B) states the specific ground, unless it was apparent from the context
>
> * * *
>
> **(b) Not Needing to Renew an Objection or Offer of Proof**. Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

Pa.R.E. 103. "A motion *in limine* may preserve an objection for appeal without any need to renew the objection at trial, but only if the trial court clearly and

definitively rules on the motion." ***Blumer v. Ford Motor Co.,*** 20 A.3d 1222, 1232 (Pa. Super. 2011).

We find no waiver based on Manufacturer's failure to reassert its pretrial objection to Rasnic's expert opinion. While remarking that "we'll see later on," the trial court denied the motion *in limine* after stating that it ultimately felt Manufacturer's arguments went more to weight than admissibility. Despite Manufacturer not renewing their objection during trial, the trial court elected not to find waiver in its subsequent Pa.R.A.P. 1925(a) statement, electing instead to address the merits of the claim and reiterate its reasoning that it stated when the motion was argued. We do the same and address the merits of Manufacturer's claim.[15]

Manufacturer believes that Rasnic's opinion had no factual foundation because there was no evidence that the deck pins became disengaged or that the platform became unseated from the side rails. Manufacturer believes that trial court erred in allowing Rasnic to offer the following opinions.

> Q: Mr. Sullivan testified a little bit more in detail during the trial on Monday, and I just want to have you assume he testified as follows: That when he assembled the scaffold, he believed that the platform was fully seated into the side rails, that the deck pins were fully engaged. He then went [on to] perform tasks associated with his job duties that day, which included climbing the scaffold, receiving materials that were slid to him in front of him by a coworker, walking on the platform from end-to-end to

---

[15] "Decisions regarding admission of expert testimony, like other evidentiary decisions, are within the sound discretion of the trial court." ***Weiner v. Fisher***, 871 A.2d 1283, 1285 (Pa. Super. 2005) (citation omitted). "We may reverse only if we find an abuse of discretion or error of law." ***Id.***

take measurements and install sheeting to metal studs. Then climbing down the scaffold, relocating it after unlocking the wheels, [setting] it up in its new location and locking the wheels, and then climbing back onto it. There was testimony that that happened, all of those steps happened with repetition at least three times before his accident.

First off, do you have an opinion within a reasonable degree of engineering certainty that what I just described for you is a foreseeable use of Werner's SRS 72 scaffold?

A: I do.

Q: Do you have an opinion within a –

A: Excuse me, and the answer is yes.

Q: Thank you for catching that. Do you have an opinion within a reasonable degree of engineering certainty that this foreseeable use that I just described for you could lead to a situation where the platform becomes dislodged resulting in the platform falling through along with the user, like Mr. Sullivan?

A: I do. The answer is yes.

Q: Do you have an opinion within a reasonable degree of engineering certainty that the defective condition that you highlighted for the jury, I should say defective conditions … was the proximate cause of Mr. Sullivan's June 26, 2015 accident?

A: I do, and the answer is yes.

N.T., 5/1/19, at 148-49.

It is well settled that expert testimony is incompetent if it lacks an adequate basis in fact. The expert is allowed only to assume the truth of testimony already in evidence. While an expert's opinion need not be based on an absolute certainty, an opinion based on mere possibilities is not competent evidence. This means that expert testimony cannot be based solely upon conjecture or surmise. An expert must do more than guess. His ... assumptions must be based upon such facts as the jury would be warranted in finding from the evidence.

*Nazarak v. Waite*, 216 A.3d 1093, 1111 (Pa. Super. 2019) (citations omitted).

All the facts that Rasnic assumed were true came from Sullivan's trial testimony. First, Sullivan testified that he assembled the scaffold like he had done "hundreds" of times before. N.T., 4/29/19, at 102. After doing so, he was satisfied that he had assembled everything correctly, which included ensuring that "the platform was appropriately secured by resting in the side rail lips and the deck pins engaged." *Id*. at 104. After rolling the scaffold to the wall, Sullivan performed the necessary tasks for installing the sheathing. This included climbing up the scaffold's rungs, having Bentzley slide up the DensGlass pieces, and then walking on the platform's surface to take the measurements. *Id*. at 110-115. After doing this, Sullivan would climb back down the scaffold and do it again two times before installing the third piece. *Id*. at 116-17. Rasnic concluded that these actions - all of which Sullivan testified to - could lead to the deck pins being rotated off and the platform then becoming unseated.

As a result, all the facts that supported Rasnic's opinion were supported by Sullivan's testimony; whether that opinion was incredible was a matter left to the jury to decide rather than the trial court, which did not abuse its discretion in deciding to allow Rasnic to give his expert opinion. Thus, we find that the first challenge to Rasnic fails.

**B.**

Finally, Manufacturer contends that the trial court erred in allowing the jury to view the videotape of Rasnic's testing of an exemplar scaffold in his workshop. "Generally, demonstrative evidence is admissible if its probative value outweighs the likelihood of improperly influencing the jury." **Pascale v. Hechinger Co. of Pa.**, 627 A.2d 750, 755 (Pa. Super. 1993) (citations omitted). "Conditions must be sufficiently close to those involved in the accident to make the probative value of the demonstration outweigh its prejudicial effect." **Id**.

First, as we briefly described earlier, the video shows an already-assembled Werner SRS-72 scaffold set at its top height. After unlocking the wheels, Rasnic unseats the platform and shows the weld protrusion on the platform's corner. He shakes the scaffold several times with the platform unseated and the deck pins rotated off, showing that the platform remains out of the frame. He then does the same thing but after engaging the deck pins, showing again that the platform remains unseated after being jarred. With the platform still unseated in one corner, Rasnic climbs a ladder and gets on the platform while holding onto the ceiling. Right after kicking off one deck pin, the platform collapses when he steps on it. Rasnic does the same thing a second time, but has to apply much more force while hanging from the ceiling.

Like their preceding argument, Manufacturer asserts that his testing depicted in the videotape lacked a factual foundation on record evidence. Manufacturer argues that Rasnic incorrectly set up the scaffold, seating the platform outside the side rails' lip. Rasnic then applied abnormal force despite there being no evidence that this, in fact, was what happened. As a result, Manufacturer asserts, it was prejudicial to show the jury the videotaped testing because it depicted a platform collapse under different circumstances than those in Sullivan's version of events. In Manufacturer's view, the testing was manipulative and misleading.

Based on our review, the trial court did not abuse its discretion in allowing the jury to view the videotape of Rasnic's testing. First, Manufacturer focuses only on those aspects of the testing that conflict with their theory of what happened, ignoring the probative aspects that supported Sullivan's theory of how the accident happened. To this end, the video shows how the weld protrusion on the one corner could prevent the platform from being seated in the side rails after it became unseated. The testing also showed how a user could unknowingly disengage the deck pins and unseat the platform, which would then collapse when the user steps on it. This result is particularly evident in the depiction of the first collapse in the video. All of this was probative to rendering Rasnic's testimony more comprehensible to the jury, which is one of the purposes of demonstrative evidence. Here, the

videotape served that purpose, helping Rasnic explain and show for the jury how he reached his conclusions. N.T., 5/1/19, at 136-147.

Nor do we find that the likelihood of the video improperly influencing the jury outweighed its probative value. Manufacturer's main argument is that the testing was not close enough to the conditions of the accident. While Manufacturer raises several salient points about how the testing did not depict what they believe happened, they raised and developed all those points during their thorough cross-examination. Thus, to the extent there were differences between the testing and Sullivan's description of what happened, Manufacturer could develop those differences through cross-examination and then implore the jury to discount the videotape's value in depicting what happened.

Accordingly, the trial court did not abuse its discretion in permitting Sullivan to show the videotape as part of Rasnic's testimony, and for the foregoing reasons, the judgment is affirmed.

Judgment affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 4/15/2021*